## CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Lamar Hampton Fields

April 10, 2014

Case No. FE-2012-0000773

By Judge Randy I. Bellows

This case presents the following question, which the Court believes to be a matter of first impression: Should a verdict be set aside and a new trial granted where it is discovered subsequent to trial that a subpoenaed defense witness, who the Court concludes would have provided material exculpatory evidence to the jury, asserted his Fifth Amendment privilege and, thereby, became an unavailable witness, based on inaccurate information unintentionally conveyed to him by his counsel?

For the reasons set out below, the Court answers this question in the affirmative, sets aside the verdict of guilty, and orders a new trial.

The case was tried by the Honorable Jonathan C. Thacher, who has since retired. The matter was set on this Court's criminal motions docket, and Judge Thacher indicated that this Court could hear the motion.

### Jurisdiction

The instant motion to set aside the verdict is filed pursuant to Rule 3A:15 of the Rules of the Supreme Court of Virginia. Rule 3A:15, in pertinent part, reads as follows:

> (b) *Motion to Set Aside Verdict.* If the jury returns a verdict of guilty, the court may, on motion of the accused made not later than 21 days after entry of a final order, set aside the

verdict for error committed during the trial or if the evidence is insufficient as a matter of law to sustain a conviction.

(c) *Judgment of Acquittal or New Trial.* The court shall enter a judgment of acquittal if it strikes the evidence or sets aside the verdict because the evidence is insufficient as a matter of law to sustain a conviction. The court shall grant a new trial if it sets aside the verdict for any other reason.

When the Court reads together the Defendant's Notice and Motion to Set Aside the Verdict and Defendant's Brief in Support of Motion to Set Aside the Verdict, it is clear that Defendant's argument is based upon both Rule 3A:15(b) and 3A:15(c). As to Section (b), the Defendant is claiming error on the part of the trial court with respect to the subpoenaed witness' assertion of the Fifth Amendment privilege of self-incrimination. As to Section (c), which "allows a trial court to 'grant a new trial if it sets aside the verdict' based on after-discovered evidence," the Defendant is claiming that the evidence presented to this Court is newly discovered evidence and warrants a new trial. See *Lamm v. Commonwealth*, 55 Va. App. 637, 642, 688 S.E.2d 295 (2010) (citation omitted). Because the Court agrees with Defendant's Section (c) argument, it need not address or reach the Section (b) arguments.

The Defendant makes three Section (b) arguments. First, he asserts that the trial court erred in not permitting counsel to cross-examine the witness regarding his reason for asserting the Fifth Amendment. Second, he asserts that the court erred by permitting the witness to invoke the Fifth Amendment because the witness had already pleaded guilty to attempted robbery. Third, he asserts that the court erred by not granting the witness immunity. See Defendant's Notice and Motion to Set Aside the Verdict 1-2.

Even though this motion is made pursuant to Section (c), the Defendant must meet the deadline for the filing of a Rule 3A:15 motion, which appears in Section (b). As stated above, that section requires that the motion be made not later than 21 days after entry of a final order. In this case, the Sentencing Order signed by Judge Thacher is dated January 14, 2014, and the motion was filed January 31, 2014, which is well within the 21 days. Thus, the motion was made timely.

The Court must also address a second jurisdictional issue, which the Court raises *sua sponte*. A Rule 3A:15 motion must not only be filed within 21 days of the final order; it must also be acted upon within 21 days. Alternatively, the Court may enter a suspending order to preserve jurisdiction to decide the matter. The case law is clear that Rule 3A:15 must be read in conjunction with Rule 1:1, which states in part: "All final judgments, orders, and decrees, irrespective of terms of court, shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer." See,

e.g., *Commonwealth v. Piccolo*, 17 Va. Cir. 3 (1988) ("[Rule 1:1] applies to orders granting new trials based on newly discovered evidence.") (citing *Smith v. Commonwealth*, 207 Va. 459, 150 S.E.2d 545 (1966)); see also *Lewis v. Commonwealth*, 18 Va. App. 5, 441 S.E.2d 47 (1994).

In the instant case, the Sentencing Order is dated January 14, 2014. In the usual course of business, the 21 days would be calculated from January 14th. However, that date must be in error since the Sentencing Order documents the sentencing proceeding, which indisputably occurred on January 16, 2014. Since the Sentencing Order could not have been signed prior to the events it describes, the date that appears on the order must be a mistake. And while it is possible for a sentencing order to be prepared and signed on the same day as the sentencing proceeding, it is far more likely that the sentencing order was prepared and signed on a subsequent day. The Court therefore presumes that the earliest date that the Sentencing Order was prepared and signed was the day after sentencing took place, in other words, on January 17, 2014. (The Court would also note that, while not dispositive, there is an indication on the Sentencing Order itself that it was not indexed by the Clerk's Office until February 3, 2014.) Since this Court issued its suspending order on February 7, without objection, that suspending order is timely. Should either party wish to have an evidentiary hearing on this matter, it should notify the Court within seven calendar days; otherwise, the Court will presume that the suspending order was timely entered.

*Facts*

A. *Proceedings Prior to the October 2013 Trial*

It is undisputed that, on April 19, 2011, an individual by the name of Deyvon Newman put a gun to the head of Anthony Hernandez and attempted to rob him. Four individuals were arrested: Mr. Newman, Davon Odems, Devon Jackson, and the Defendant.

Mr. Newman pleaded guilty to one count of attempted robbery and one count of use of a firearm in the commission of a felony, first offense, in Case No. FE-2011-1461, and was sentenced on June 8, 2012, by the Honorable Jan L. Brodie to eight years in prison with six years suspended on the attempted robbery and to a three year mandatory consecutive sentence on the firearms offense, to be followed by eight years of probation. His total amount of active incarceration was five years.

Mr. Odems was originally charged with three offenses: attempted robbery, abduction, and use of a firearm in the commission of a felony. The abduction charge and the use of a firearm charge were *nolle pross*ed when the Mr. Odems waived a preliminary hearing. Mr. Odems was then indicted on two charges, attempted robbery and misdemeanor assault, and pleaded

guilty to both. See Case No. FE-2011-978. He was sentenced on November 4, 2011, by the Honorable Bruce D. White to five years in prison on the attempted robbery and twelve months in jail on the assault, such time to run concurrently to each other, with no time suspended, to be followed by three years of post-release supervision. His total amount of active incarceration was five years. (It should be noted that the Presentence Investigation Report for Lamar Fields indicates that three years of the five-year sentence imposed upon Mr. Odems was suspended. That is not the case; no time was suspended.)

In Case No. FE-2011-1834, Mr. Jackson pleaded not guilty to abduction, attempted robbery, and use of a firearm in the commission of a felony, and, on April 3, 2012, was found not guilty by a jury on all three counts.

In May 2012, the Defendant was indicted on three offenses: Abduction (Count I), Attempted Robbery (Count II), and Use of a Firearm in the Commission of a Felony (Count III).

On November 19, 2012, the case was tried to a jury. Prior to trial, the Commonwealth moved to *nolle prosequi* Count I (Abduction), which motion the Court granted. At the end of the Commonwealth's case, the Court granted a motion to strike as to Count III (Use of a Firearm in the Commission of a Felony) and dismissed the count. The matter went to the jury on Count II (Attempted Robbery) only. On November 20, 2012, after the jury informed the Court that it was unable to reach a verdict, the Court declared a mistrial. There is a note from the jury in the file indicating that the jury was "deadlocked 8-4."

B. *The October 2013 Trial*

On October 28, 2013, the matter came before the Court for retrial.

1. *David Odems' Assertion of the Fifth Amendment Privilege*

Before trial began, Robert Frank of the Office of Public Defender raised a preliminary matter. He advised the Court that Mr. Fields' defense counsel, Charles Swedish, had subpoenaed Davon Odems for trial, who had previously been represented by the public defender's office in connection with his own case. According to Mr. Frank, Mr. Odems was serving his sentence. Mr. Frank stated that: "I have advised him with regards to his Constitutional rights and I believe he is going to exercise his Fifth Amendment rights and I'm wondering if we can get that resolved before you bring the jury in and before this argument." Tr. 3-4.

Mr. Swedish responded: "That's fine, Your Honor. I did speak with Mr. Odems before, and he had indicated to me that he was willing to testify and was coming to testify and I would ask that Your Honor, if that is the case, that you advise Mr. Odems of the Virginia statute that states that anything that he says in court could not be used against him." The Court declined to advise

Mr. Odems, noting that he had counsel and counsel was "perfectly capable of advising him what the Virginia statute says concerning that." Tr. 4.

Mr. Swedish stated that he had the right to call Mr. Odems as a witness, but the Court replied that, in light of the fact that Mr. Odems' attorney had advised the Court that he intended to exercise his Fifth Amendment privilege, Mr. Swedish could not call him in the presence of the jury merely for the purpose of exercising that right. Tr. 5. The Court did order that Mr. Odems be brought out, and this was done prior to jury selection. Tr. 5-6. The following colloquy took place:

> THE COURT: Are you Davon Odems?
>
> MR. ODEMS: Correct.
>
> THE COURT: Mr. Odems, the Court has been advised by Mr. Swedish, who is counsel for Mr. Fields, that he intends to call you as a witness in this trial and your counsel has advised the Court that it would be your intention to exercise your Fifth Amendment Constitutional right and refuse to testify. Is that true?
>
> MR. ODEMS: Correct.
>
> THE COURT: So, if called, it is your intention to exercise your Fifth Amendment right against self incrimination?
>
> MR. ODEMS: Correct.

Following this colloquy, Mr. Swedish asked to reserve the right to call Mr. Odems outside the presence of the jury at a later time. The Court stated: "We will bring the jury in and then at such time if I decide to let you do that, we will have to call Mr. Frank and have him come back over, but I don't that's — I think that is a futile process in light of the fact that he is with counsel, in court, exercising his Fifth Amendment privilege." Tr. 8.

### 2. *Testimony of Anthony Hernandez*

After jury selection, the Commonwealth called its first witness, Anthony Hernandez. Hernandez testified that he was "caught up" in a "previous drug bust" and agreed to help out the police in return for not getting charged. Specifically, he agreed to set up a cocaine purchase with an individual he knew as "Von," later identified as Davon Odems. The plan, according to Mr. Hernandez, was that a police team would move in on the vehicle in which Von (Odems) was a passenger once Mr. Hernandez saw the drugs. The police drove Mr. Hernandez to the Silver Diner in Tysons Corner. Mr. Hernandez indicated that he and Von (Odems) had been texting back and

forth: "We were talking about whether or not the drugs were with them and he kept asking me if we were strapped, meaning carrying guns." Tr. 57.

The vehicle containing Von (Odems) arrived around 11:00 p.m. The plan that Mr. Hernandez had worked out with the police was as follows: "I was supposed to go there, see the drugs, go back to the car, basically it was supposed to be me going to the car, making sure that the drugs were there, going back and letting the detective know that from there he took care of everything." Tr. 62.

Mr. Hernandez testified that he got out of the detective's car and walked over to the vehicle in which Von (Odems) was a passenger. Tr. 58. He said that an individual got out of the back seat (driver's side) in order to let Mr. Hernandez into the vehicle. That individual was later identified as Mr. Newman. When Mr. Hernandez entered the vehicle, there were already four persons in it: Mr. Jackson, the driver; Mr. Odems, the front passenger; Mr. Newman, to Mr. Hernandez's left; and the Defendant, to Mr. Hernandez' right. Tr. 60.

Mr. Hernandez stated that the only person he had met prior to entering the car was Von (Odems). Tr. 60. Von (Odems) began asking: "where's the money at." Tr. 60. Mr. Hernandez responded: "I don't have the money. That my boy has the money and I ask him where the drugs are and he keeps asking me where the money is and if my boy is strapped." Tr. 61. At that point, the person to Mr. Hernandez's left (Mr. Newman) put a gun to his head. Tr. 61. Mr. Hernandez stated: "[Newman] starts using vulgar language, where's the money, and your boy better not be strapped, things like that." Tr. 61-62. Mr. Hernandez was then told to call his associate and he did so, telling the detective that "everything was Gucci, meaning that the drugs were there, and everything was fine." Tr. 62.

As to what the Defendant was doing during this period, Mr. Hernandez testified that he was "[r]unning through my pockets." Tr. 63. Von (Odems) then got out of the vehicle, walked over to the car containing the detective, and the detective drove off. At that point, Von (Odems) came back, asked Hernandez "what the hell is going on," and stated that he was "not leaving until they get the money." Tr. 63. Mr. Hernandez testified that he did not feel he could leave the vehicle because the Defendant was to his right and Mr. Newman was to his left, with a gun to his head. Tr. 64.

After Von (Odems) returned to the vehicle, he and the driver (Mr. Jackson) discussed "back and forth but that I was basically staying in the vehicle and they started to drive off. At that point, I guess you could say the crime unit or the police, they were coming forward towards us with an SUV. At that point, the police came out with guns pointed at the vehicle. So after that, everybody was frozen. Two people ran and I was still in the vehicle." Tr. 65. All four individuals in the vehicle were apprehended. Tr. 65.

Defense counsel cross-examined Mr. Hernandez, and elicited the following: (1) there were three or four potential felony drug charges that Mr.

Hernandez was attempting to avoid through his cooperation; (2) the drug deal was set up with Von (Odems) on the day of the planned transaction, but Von (Odems) told Mr. Hernandez that he did not have a ride and had to make sure he could get one; (3) originally, the plan was to meet at the Centreville Multiplex but it was changed to the Tysons Corner Silver Diner; (4) the deal was set up by text between Von (Odems) and Mr. Hernandez; (5) the last communication was by phone when Von (Odems) told Mr. Hernandez that he was in the parking lot; (6) both the Defendant and the individual with the gun (Mr. Newman) went through Mr. Hernandez's pockets; (7) Mr. Hernandez claims he told Detective Andrew Smuck on the day of the incident that the Defendant had gone through his pockets, but he acknowledges that the police report does not so indicate; (8) Mr. Hernandez claims that he later asked Detective Smuck why he had not put that information into his police report; and (9) Mr. Hernandez agreed with Mr. Swedish's statement that "you're here with the intention of getting a conviction out of this so you don't get convicted yourself." Tr. 67-78.

### 3. Testimony of Detective Jared Lytle

Detective Jared Lytle interrogated the Defendant on the night of the incident and asserted that the Defendant made the following statements after waiving his Miranda rights: (1) Mr. Odems told the Defendant and Mr. Jackson that they needed to go pick another person up and that Mr. Odems was going to get the Defendant and Mr. Jackson "some money." Tr. 88. (2) The Defendant knew "they" were going to commit a strong-arm robbery. Tr. 89. (3) During the drive to Tysons Corner, "they" discussed how they were going to commit the robbery. Tr. 89. (4) The plan was to pretend that a bag in the car contained the drugs, and to rob the victim when he got into the car. Tr. 89. (5) The Defendant did not know that a gun would be involved in the robbery until it was produced. Tr. 90. (6) The Defendant ran when a big truck hit the car. Tr. 90.

Defense counsel sought to undermine Detective Lytle's testimony, as follows: (1) Detective Lytle never recorded any of the 50-100 interviews he did while he was a narcotics detective. Tr. 92. (2) There are interrogation rooms that have recording capability. Tr. 93. (3) No one would have stopped Detective Lytle had he wanted to record an interrogation. Tr. 93. (4) Even though his interview with the Defendant lasted 35-45 minutes, his police report of the interview is only 9 or 10 lines. Tr. 95.

On redirect, the Commonwealth had the detective read directly from his notes, which contained the following quotes: "Get them some money." "I knew we were going to strong arm rob someone." "We were going to show them a girl's bag and say the drugs were in that then when the victim got in the car, we were going to rob him." "I honestly didn't know about the gun." "Man, I really messed up." "This is serious." "I knew what was going on when the cops hit the car. I ran." Tr. 104-05.

### 4. *Testimony of Detective Andrew Smuck*

Detective Smuck confirmed that Mr. Hernandez agreed to cooperate in exchange for having his charges reduced or not being charged at all. Tr. 111. He indicated that the plan was that "our street crimes unit, once [Mr. Hernandez] arrived and verified that he had the cocaine, our street crimes unit would just move in and effect an arrest." Tr. 114. The deal was set for six ounces of cocaine for $7,200. Tr. 115. Detective Smuck further explained: "So the plan was when we arrived at the Silver Diner, Mr. Hernandez would go over to the subject's vehicle who we knew was Von. He would get in Von's vehicle. He would confirm that the cocaine was there and then he would come back to my vehicle telling Von that he was going back to my vehicle to get the money. At that point, once he came back to my vehicle, the cocaine was there and the street crimes unit would move in and effect the arrest of Von." Tr. 115.

Detective Smuck testified that 30 to 40 seconds elapsed after Mr. Hernandez got into Von's vehicle, at which point Detective Smuck got a phone call from Mr. Hernandez stating "it's all Gucci," which meant the cocaine was there. Tr. 118. The plan, however, was for Mr. Hernandez to get out of the vehicle and go back to Detective Smuck's vehicle. Thus, the "fact that he was calling me and telling me now to bring the money to him didn't make sense to me." Tr. 118. At that point, the front passenger door opened and an individual exited who was yelling and agitated. Tr. 119. Detective Smuck pulled out of the parking lot and gave the signal to the street crimes unit to move in for the arrest. Tr. 119.

On cross-examination, Detective Smuck indicated that Mr. Hernandez faced two or three potential cocaine distribution charges and was cooperating to avoid prosecution. Tr. 128. Detective Smuck also testified that, on the night of the incident and again two days later, Mr. Hernandez told him that it was Mr. Newman that went through his pockets and took $10, a license, and a cell phone. Tr. 135. Detective Smuck stated that Mr. Hernandez did not disclose until months later that the Defendant had also gone through his pockets. Tr. 135. Detective Smuck stated that, when he asked Mr. Hernandez why he had failed to previously mention that the Defendant had gone through his pockets, Mr. Hernandez stated that "he didn't remember that happening at the time." Tr. 136. According to the detective, Mr. Hernandez attributed this failure of recollection to being "under a lot of stress" and having a gun to his head. Tr. 137-38.

Following the testimony of Detective Smuck, the Commonwealth rested.

## 5. Revisiting the Issue of Davon Odems' Assertion of the Fifth Amendment Privilege

Prior to the making his motion to strike, defense counsel asked the Court to revisit Mr. Odems' assertion of the privilege. He made several arguments. First, he argued that, by pleading guilty, Mr. Odems had waived his Fifth Amendment privilege. Second, he proffered that Mr. Odems would testify that he did not know the Defendant and that the Defendant had no involvement in the planning of the robbery. Third, he argued that, under Va. Code § 19.2-270, anything Mr. Odems said on the stand could not be used against him. Fourth, he argued that the Court should grant Mr. Odems immunity. Finally, Mr. Swedish argued that he should be permitted to testify as to the exculpatory statements that Mr. Odems had made to Mr. Swedish. Tr. 140-57. The Court ruled that Mr. Swedish would not be permitted to testify. Tr. 153. The Court also denied the Motion to Strike. Tr. 153-59.

## 6. The Defense Case

The Defendant called three witnesses.

Vivian Tran, who was the owner of the car and the girlfriend of the driver, Mr. Jackson, testified that she was at a party at Mr. Odems' house when Mr. Odems asked if he could use her car and promised to give her gas money to fill up her tank. Tr. 160-61. The Defendant and Mr. Jackson were supposed to drop off Mr. Odems and then return with the car.

Devon Jackson testified that he and the Defendant were childhood friends and that they were both present at a "get together" at Mr. Odems' house. He stated that Mr. Odems approached him at the party and asked if he had a vehicle he could use. Mr. Odems told Mr. Jackson that he needed to get dropped off because he was going to stay somewhere else. Mr. Jackson told Mr. Odems he did not have a vehicle but that his girlfriend did. Since Mr. Jackson's girlfriend needed the gas money, Mr. Jackson agreed to transport Mr. Odems. Mr. Jackson asked the Defendant to accompany him because he was not familiar with the location of the Silver Diner at Tysons Corner. Mr. Jackson testified that he was initially going to transport Mr. Odems to Centreville, but that the location changed before they got into the car. Before going to the Silver Diner, they picked up Mr. Newman, who was a friend of Mr. Odems. Mr. Jackson testified that he did not know that Mr. Odems and Mr. Newman were planning a robbery. During the drive, there was no discussion of a robbery or drugs. On cross-examination, Mr. Jackson acknowledged that his girlfriend's purse was in the car. Tr. 164-94.

Finally, the Defendant testified and denied any involvement in the planning or execution of the robbery. He said that he went along with Mr. Jackson because Mr. Jackson did not want to ride alone. He testified: "I was just going for the ride and then come right back with my cousin."

Tr. 195-98. The Defendant denied telling Detective Lytle that he knew a robbery was going to happen or knew a strong-arm robbery was going to happen. Tr. 198. The Defendant testified that he told Detective Lytle that he only knew what was going on "when it was happening." Tr. 199. On cross-examination, the Defendant denied making the following statements that Detective Lytle recorded in his notes: (1) "I knew we were going to strong arm someone;" (2) "We were going to show them a girl's bag and say the drugs were in that;" (3) "Then, when the victim got in the car, we were going to rob them;" (4) Mr. Odems came up to him and said `Hey, let's go get some money';" (5) "Man, I really messed up. This is serious;" and (6) "I knew what was going on when the cops hit the car and I ran." Tr. 204-06. He acknowledges telling Detective Lytle that "I honestly didn't know about the gun." Tr. 205.

## C. *The Verdict and Sentencing*

The Commonwealth put on no rebuttal testimony. The case went to the jury and the Defendant was found guilty of attempted robbery. The jury set the Defendant's sentence at four years imprisonment. The Court revoked the Defendant's bond and set sentencing for January 16, 2014. In both the presentence report and at sentencing, the Defendant maintained his innocence. The Court sentenced the Defendant to four years imprisonment, with two years suspended and two years probation.

## D. *Defendant's Motion To Set Aside the Verdict*

On January 31, 2014, the Defendant filed a motion to set aside the verdict and noticed the motion for February 7, 2014. The motion states in pertinent part:

> Davon Ahkeem Odems was subpoenaed by counsel for the defendant to testify on behalf of the defendant.
>
> Prior to his being called as a witness, Mr. Odems was visited in the Fairfax jail by an attorney in the Public Defender's Office who had not previously represented Mr. Odems. That attorney told Mr. Odems that he was contacted by the prosecutor and told to tell Mr. Odems that he would be reindicted on charges that were previously *nolle pross*ed that were related to the charges that he pleaded guilty to previously;
>
> Mr. Odems was a codefendant with the defendant. Mr. Odems pleaded guilty previously to one count of attempted robbery and one count of assault. There was a plea agreement with the Commonwealth that, if Mr. Odems pleaded guilty to

those charges, no other charges that were related with the case would be brought against him, including *nolle pross*ed charges.

The plea agreement also stated that, in pleading guilty, Mr. Odems waived his right against self incrimination (see paragraph 6 of the plea agreement).

Mr. Odems would have testified that the defendant had nothing to do with the robbery that he had pleaded guilty to if it were not for the misinformation that he received.

Attached to the pleading was a sworn affidavit from Mr. Odems. That affidavit states in part the following:

On October 25, 2013, I was visited in the jail by an attorney, Mr. Frank, who works in the public defender's office. Mr. Frank had never represented me before;

Mr. Frank told me that he was my attorney. He asked if I was willing to testify on behalf of Lamar Fields. I told him that I wanted to testify;

Mr. Frank then told me that he was told by the prosecutor that if I testified, the Commonwealth would reindict me on the charges that were related to my case which were previously *nolle pross*ed by the Commonwealth in exchange for my guilty plea in my case;

Based on the threat that I would be charged with the charges that were previously dropped, I decided to tell Judge Jonathan Thacher that I would plead the Fifth at trial. I was not brought out to testify at trial.

I would have testified that Lamar Fields had nothing to do with the robbery that I and Deyvon Newman had planned.

Also attached to the pleading were Mr. Odems' plea agreements, pursuant to which he entered pleas to attempted robbery and assault. The plea agreements contained the following statements:

The Commonwealth agrees that any active incarceration be capped at 5 years. The Commonwealth agrees that no other charges related to this case will be brought. The Commonwealth *nolle prossequi*'d related charges at the preliminary hearing. All other terms and conditions to be set by the Court.

The word "charges" appears in the assault plea agreement but not in the attempted robbery plea agreement. This was obviously an unintentional oversight.

The Commonwealth filed an opposition motion to Defendant's motion to set aside the verdict, and represented that it had never told Mr. Odems' counsel that the Commonwealth would bring back the *nolle pross*ed charges if Mr. Odems testified on behalf of the Defendant. The Commonwealth also argued that Mr. Odems retained the right to assert the Fifth Amendment even after having pleaded guilty.

### E. *The February 7, 2014, Hearing*

The matter came before this Court for a hearing on February 7, 2014. The Court set an evidentiary hearing in the case for March 13, 2014.

Mr. Swedish subpoenaed Mr. Frank to testify at the hearing. The Office of Public Defender filed a motion to quash the subpoena. The Court convened a hearing on the motion to quash on March 6, 2014. At the hearing, the Court ordered Mr. Frank to be present at the March 13, 2014, hearing and ordered that he be prepared to testify. At the request of Todd Petit, Public Defender, the Court permitted the Office of Public Defender to withdraw from further representation of Mr. Odems. The Court subsequently appointed another member of the bar, Jenna Sands, to represent Mr. Odems and to advise him on issues related to the attorney-client privilege and whether he should waive the privilege at the March 13, 2014, hearing in order to permit Mr. Frank to testify with regard to the meeting described in Mr. Odems' affidavit.

### F. *The March 13, 2014, Hearing*

Mr. Odems testified that he had been subpoenaed to testify at the Defendant's trial on October 28, 2013. He acknowledged that he asserted the Fifth Amendment privilege before Judge Thacher. He stated that, before doing so, he consulted with Mr. Frank and, as a result of that consultation, he believed the prosecutor was going to bring back related charges if he testified at the trial. He testified that he would not have pleaded the Fifth if he had known this was not the case. Tr. 8. He acknowledged that Mr. Frank also told him that, if he made a false statement at trial, he could be charged with perjury. Tr. 15. Mr. Odems testified that "[m]y whole thought was whether I was going to be facing new charges or related charges. If I couldn't be, then I wasn't worrying about testifying. So my whole problem with it was, if I would have any other charge related to that, I don't want no new time." Tr. 16. He said he did not remember that his plea agreement stated that the charges could not be brought back, "but if I had knew that, I was fine and willing to go on that day with not pleading the Fifth." Tr. 16-17. Mr. Odems made it clear that his concern was the possibility of new charges, not the possibility of a perjury prosecution:

Q. As far as you were concerned, all you were worried about was the old charges?

A. Yeah.

Q. You weren't worried about the perjury charges that Mr. Frank was telling you about?

A. Correct.

Tr. 19. Mr. Odems testified that Mr. Frank told him "that the prosecutor came to see him and that they could bring the charges that were *nol prossed* and related charges to this case on me." Tr. 32. Mr. Frank did not tell him it "would" happen, but rather that it "could" happen. Tr, 33. Mr. Odems also stated that had he testified, he would have stated that he did not know the Defendant, that it was Mr. Odems and Mr. Newman that planned the robbery, and that the Defendant did not know anything about it. Tr. 57-58. Furthermore, he testified that he did not witness the Defendant going through Mr. Hernandez's pockets and that he "was turned around the whole time looking at them." Tr. 64.

Mr. Frank then testified and stated the following: (1) He knew Mr. Odems was being brought back to testify because Mr. Holt, the Assistant Commonwealth's Attorney, kept him apprised of the "procedural history;" (2) Mr. Holt only advised Mr. Frank as to the dates of the trial; (3) No prosecutor in the Office of the Commonwealth's Attorney ever told Mr. Frank that, if Mr. Odems testified on behalf of the Defendant, the charges previously *nolle prossed* would be brought back; (4) Mr. Frank saw Mr. Odems on October 25, 2014, which was three days before the trial. He told Mr. Odems that "testifying was a no-win proposition for him, that it could not help him, it could only hurt him. He made it clear that he wanted to help Mr. Fields, and I explained to him that the potential existed for charges to come back;" (5) Mr. Frank stated that he had not been the public defender who had previously represented Mr. Odems and he did not have the plea agreement that Mr. Odems had signed; therefore, he did not know that the plea agreement had "the terms that made it pretty clear that those charges could not be brought back;" (6) Mr. Frank stated that he "explained to him that the potential existed [for the charges to be brought back], plus there was always the potential for perjury, because, even though his testimony was immunized as to what he said in Mr. Fields' trial, for purposes of perjury, it was not;" (7) Mr. Frank did not tell Mr. Odems that the charges "would" be brought back but, rather, that they "could" be brought back; (8) Mr. Frank stated that he had also been present on an earlier trial date in July 2013 that had to be continued because Mr. Odems had not been brought up and that "[t]he only reason I knew about it at all was that Mr. Holt had seen me walking by and felt that Mr. Odems needed some advice from his counsel;"

and (9) Mr. Frank testified that the reason he told Mr. Odems that there was a potential for the *nolle pross*ed charges to be brought back was that "[m] ost plea agreements don't contain that specific language, and so I felt the door was still open. I told him I didn't believe it would happen, I didn't expect it would happen, but it could happen and therefore it wasn't in his interest to testify. But I also mentioned the potential for perjury charges." Tr. 47-53.

Prior to Mr. Frank testifying, Mr. Odems waived his attorney-client privilege, and his new attorney, Ms. Sands, agreed that he had made a knowing, intelligent, and voluntary waiver of the privilege. Tr. 42-43. The Court then found that there had been a waiver of the privilege, that it was a knowing, intelligent, and voluntary waiver, and that, even absent a waiver, the Court would find that the privilege was waived based on his execution of the affidavit and his testimony at the hearing. The Court then ordered Mr. Frank to testify. Tr. 46-47.

After argument, the Court took the matter under advisement.

*Findings with Regard to Mr. Odems'*
*Assertion of the Fifth Amendment*

The Court makes the following findings of fact with regard to Mr. Odems' assertion of the Fifth Amendment privilege at the Defendant's October 28, 2013, trial.

1. The sole reason Mr. Odems asserted the Fifth Amendment was his concern that the Commonwealth could bring back the abduction and the use of a firearm charges that were previously *nolle pross*ed.

2. The reason Mr. Odems had this concern was because Mr. Frank incorrectly (but certainly unintentionally) advised him that this was a possible consequence of his testifying on the Defendant's behalf.

3. While Mr. Frank also advised Mr. Odems about the potential for a perjury prosecution, this did not factor into Mr. Odems' decision to assert the Fifth Amendment privilege.

In any event, "[a] witness may not claim the privilege of the fifth amendment out of fear that he will be prosecuted for perjury for what he is about to say." *United States v. Whittington*, 783 F.2d 1210, 1218 (1986) (footnote omitted). Put simply, "[t]here is `no doctrine of anticipatory perjury'." *Earp v. Cullen*, 623 F.3d 1065, 1070 (2010) (quoting *United States v. Apfelbaum*, 445 U.S. 115, 131, 100 S. Ct. 948, 63 L. Ed. 2d 250 (1980)) (internal quotations omitted).

4. No member of the Office of Commonwealth's Attorney told Mr. Frank that, if Mr. Odems testified he would, or even could, be reindicted on the previously *nolle pross*ed charges. Mr. Frank's advice to Mr. Odems was based on Mr. Frank's *own* analysis of the situation, not based on a warning given to Mr. Frank by the Commonwealth.

Thus, there is no basis to conclude that there was any governmental misconduct. See, e.g., *United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991) (citations omitted) (finding that a defendant's due process rights are violated if there is "substantial government interference with a defense witness' free and unhampered choice to testify").

## Analysis

There is no exact precedent for the instant situation. A Brady analysis does not apply; this case does not involve any allegation of the Commonwealth's failing to turn over exculpatory or impeachment evidence. A newly discovered evidence analysis does not quite apply either, but it does come closest to setting out a standard against which the instant facts may be measured.

It is well established that, before a new trial can be granted based upon an allegation of newly discovered evidence, four requirements must be met: "(1) the evidence was discovered after trial; (2) it could not have been obtained prior to trial through the exercise of reasonable diligence; (3) it is not merely cumulative, corroborative, or collateral; and (4) it is material and, as such, should produce an opposite result on the merits at another trial." *Mundy v. Commonwealth*, 11 Va. App. 461, 480, 390 S.E.2d 525 (1990) (citations omitted).

This last requirement has been expressed in a number of ways by the higher courts of Virginia. See, e.g., *Lamm*, 55 Va. App. at 642 ("[A] defendant must prove . . . that the evidence is material to the extent that it is likely to produce different results from a new trial."); see also *Carter v. Commonwealth*, 10 Va. App. 507, 513, 393 S.E.2d 639 (1990) (citation omitted) ("Before setting aside a verdict [on the basis of new evidence being offered to establish perjury], the trial court must have evidence before it to show in a clear and convincing manner 'as to leave no room for doubt' that the after-discovered evidence, if true would produce a different result at another trial."). "The burden is on the moving party to show that all four of these requirements have been met in order to justify a new trial." *Johnson v. Commonwealth*, 41 Va. App. 37, 43, 581 S.E.2d 880 (2003) (citation omitted).

Motions for a new trial based upon newly discovered evidence "are addressed to the sound discretion of the trial judge, are not looked upon with favor because of the obvious opportunity and temptation that arises for fabrication of such evidence, must be considered with special care and caution, and should be granted only with great reluctance." *Mundy*, 11 Va. App. at 481 (citations omitted); see also *Odum v. Commonwealth*, 225 Va. 123, 130, 301 S.E.2d 145 (1983). A motion for a new trial "will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented." *Orndorff v. Commonwealth*, 271 Va. 486, 501, 628 S.E.2d 344 (2006). In short, a defendant seeking a new trial based on newly discovered evidence faces a "steep burden." *Lamm*, 55 Va. App. at 645.

The first requirement, that the evidence be discovered after the trial, illustrates the fact that the newly discovered evidence standard is not a perfect rubric for the analysis of the situation now before the Court. Is Davon Odems a newly discovered witness? Obviously, he is not; indeed, he was subpoenaed by the Defendant to testify at the Defendant's trial but refused to do so because he was misadvised by his attorney as to the potential consequences of his testimony. What he is, however, is a newly *available* witness. Today, with the knowledge that he cannot be prosecuted for charges previously *nolle pross*ed, he is prepared to testify. And while it is certainly true that newly *available* is not the same as newly *discovered*, both conditions address the same concern: A defendant ought not be able to sit on evidence, see how the trial works out and, if he is found guilty, simply obtain a do-over. What happened here bears no resemblance to such a situation. Defense counsel subpoenaed Mr. Odems. Defense counsel tried to obtain his testimony at trial. And, when defense counsel learned that Mr. Odems was asserting his Fifth Amendment privilege, he proposed that the Court grant Mr. Odems immunity or, alternatively, let defense counsel testify to what Mr. Odems had told him. The point is not that the trial court should have granted these requests; in this Court's opinion, the trial court properly rejected them. The point, though, is that it demonstrates defense counsel's unwavering determination to place this witness, or at least his statements, before the jury. In other words, this is anything but a case where defense counsel made a strategic judgment that did not work out and is seeking to try out an alternative strategy. If the requirement that evidence be newly discovered is intended to prevent strategic gamesmanship, that objective is in no way undermined by treating a truly *unavailable* witness the same as a truly *undiscovered* witness.

The second requirement, that the evidence could not have been obtained through the exercise of due diligence, is fully established here. Defense counsel did all he could have done to obtain the testimony of Mr. Odems. He interviewed him. He subpoenaed him. He asked the Court for permission to examine Mr. Odems with regard to his rationale for the assertion of the privilege. And he raised the issue again at the motion to strike. There was nothing more that defense counsel could have done to obtain Mr. Odems' testimony. See, e.g., *Orndorff v. Commonwealth*, 271 Va. 486, 502, 628 S.E.2d 344 (2006) (citation omitted) (finding that defendant "was required to show that she actually attempted to secure such [newly discovered] evidence in a diligent and timely manner but was prevented from obtaining the evidence for a particular reason"). Here, what prevented the Defendant from obtaining the evidence was the fact that Mr. Odems was incorrectly told by his counsel that he could face prosecution for charges previously *nolle pross*ed if he testified.

At this point, it is also necessary to address the following question: Does it matter why Mr. Odems *chose not to testify*? It does. The Court must

determine whether counsel exercised due diligence, a determination that would be difficult or impossible to make without knowing why a witness did not testify. For example, if a witness did not appear at trial because Defendant's counsel failed to subpoena him, that would not pass the "due diligence" test. If, on the other hand, the witness did not testify because he was ill or was not transported to court, that would not indicate a lack of due diligence. The reason why a witness did not appear or did not testify is very important. In this case, that reason conclusively establishes that Mr. Swedish acted with due diligence and that the witness' refusal to testify were for reasons entirely beyond Mr. Swedish's control.

The third requirement, that the evidence is not merely cumulative, corroborative, or collateral, is also established here. Mr. Odems is the man behind the attempted robbery. He plotted it, set it into motion, and arranged for the meeting with Mr. Hernandez at which the robbery was to take place. He pleaded guilty and was sentenced to serve five years in prison. He is in a nearly unique position to exculpate the Defendant since he is able to address both the Defendant's lack of involvement in the planning of the robbery and the Defendant's lack of involvement in the execution of what turned out to constitute an attempted robbery. The Court uses the term "nearly unique" because there is one other witness who theoretically could testify to the Defendant's involvement or lack of involvement in the planning of the robbery, i.e., Deyvon Newman. Mr. Newman was not called as a witness at the trial.

It might be argued that, since the Defendant testified at trial and denied involvement in the planning or execution of the robbery, the testimony of Mr. Odems would be cumulative or merely corroborative. It is true that the Defendant testified, but a jury might well discount or dismiss the testimony of a defendant whom the jury might conclude had a compelling reason to fabricate his testimony.

It might also be argued that, since the driver of the vehicle, Devon Jackson, testified at trial, Mr. Odems' testimony would merely be corroborating Mr. Jackson's denial of involvement. But Mr. Jackson, who denied knowing anything about a robbery until Mr. Newman pulled a gun on Mr. Hernandez, cannot testify to the Defendant's own lack of participation in the planning of the robbery. Only the actual planners of the robbery could testify to that. This is not to say that Mr. Jackson's testimony is insignificant. He gives a legitimate explanation for the presence of the Defendant in the vehicle, and he also states that there was no discussion of the robbery in the car on the way to the Silver Diner.

In contrast, Mr. Odems did plan the robbery and, therefore, is in a position to testify to the Defendant's lack of involvement in it. Equally important, Mr. Odems would testify as someone who admitted his own guilt, and was paying a very high price, five years incarceration, for his involvement in the attempted robbery. And while the Defendant would derive an obvious

and tangible benefit from an acquittal, there is nothing before the Court to indicate any tangible benefit, obvious or otherwise, that Mr. Odems would derive from the Defendant's being acquitted.

The final requirement, that the evidence is material and, as such, should produce an opposite result on the merits at another trial, is also met here. Mr. Odems' testimony directly contradicts the Commonwealth's theory of the case. Mr. Odems would testify that the Defendant was not involved in the planning of the robbery and did not participate in its execution. Had the jury "heard and believed [this testimony]" it "would necessarily have produced a different result." *Hines v. Commonwealth*, 136 Va. 728, 750-51, 117 S.E. 843 (1923); see *Gatling v. Commonwealth*, 14 Va. App. 60, 62, 414 S.E.2d 862 (1992); *Whittington v. Commonwealth*, 5 Va. App. 212, 215, 361 S.E.2d 449 (1987); see also *Lamm*, 55 Va. App. at 643 ("[*Hines, Gatling*, and *Whittington* all] involved evidence that, if believed credible, would clearly have resulted in an acquittal."). The conclusion of the *Lamm* court regarding *Hines, Gatling*, and *Whittington* is true here as well. If the jury believed the testimony of Mr. Odems, the Defendant would be acquitted. This is not, then, the sort of evidence that, even if true, would make no difference in the outcome of the case.

That is not the end of the matter, however, for the Court must actually weigh Mr. Odems' exculpatory evidence (and the other exculpatory evidence presented at trial) against the evidence presented to the jury that purportedly incriminates the Defendant. "When, as here, the evidence supporting the new trial motion is contradicted by evidence in opposition to the motion, the circuit court is not permitted to presume that the moving party's evidence is true but is required to weigh all the evidence presented in determining whether the moving party has satisfied the materiality standard . . . ." *Orndorff*, 271 Va. at 504-05 (citations omitted). "Thus, when a circuit court is presented with conflicting evidence in considering a motion for a new trial, the court's role resembles that of a fact finder in determining whether the evidence is such that it should produce an opposite result on the merits at a new trial." *Id.* at 505 (citations omitted).

With that in mind, the Court will proceed to consider, first, the exculpatory nature of Mr. Odems' testimony, second, the other exculpatory evidence before the jury, and, third, the inculpatory evidence before the jury.

First, with regard to Mr. Odems' testimony, it directly exculpates the Defendant. As stated above, if his testimony is believed, the Defendant would be acquitted. But *should* Mr. Odems be believed? He is, after all, a convicted felon and the individual who planned and set up this attempted robbery. But, just as Assistant Commonwealth's Attorney Holt argued with regard to Mr. Hernandez: "Does the Commonwealth want rabbis, priests, and ministers to be our witnesses in these type of cases? Absolutely. But we take what we have . . . ." The defense also is often forced to rely on individuals engaged in felonious conduct. In Mr. Odems' favor is this,

unlike Mr. Hernandez, who admits to seeking the Defendant's conviction in order to avoid a conviction of his own, there is nothing before the Court to indicate a benefit that Mr. Odems would derive from his testimony.

As to the exculpatory evidence that was actually presented to the jury, it consists of the following: (1) the Defendant's own testimony denying any involvement in the planning or execution of the robbery; (2) the testimony of Mr. Jackson, the driver of the vehicle, denying any discussion of robbery planning while driving to the Silver Diner, and his explanation for why the Defendant was in the car; and (3) the testimony of Vivian Tran, Mr. Jackson's girlfriend, which corroborates Mr. Jackson's testimony that he was just doing a favor for Mr. Odems in return for gas money.

As to inculpatory evidence, it consists of four things: (1) the Defendant's presence in the car; (2) Mr. Hernandez' testimony that the Defendant went through his pockets; (3) the Defendant's attempt to run; and (4) the Defendant's statements to the police.

### 1. *Presence in the Car*

The Defendant testified that he was present in the car because Mr. Jackson asked the Defendant to ride with him so that he would not be driving home alone. Tr. 197. Mr. Jackson testified that he asked the Defendant to come along because he was not sure how to get back from Tysons Corner, an area with which Mr. Jackson was not familiar. Tr. 170-71. The Defendant's presence in the car, like Mr. Jackson's presence in the car, does not prove that either individual participated in the crime, especially when there was a reasonable explanation for their presence.

At two points during the trial, defense counsel tried to elicit the fact that Mr. Jackson, who was not only present in the vehicle but the driver of the vehicle, was acquitted at trial. Because the outcome of Mr. Jackson's trial was legally irrelevant to the outcome of the Defendant's trial, the Court did not allow it. Tr. 69, 130.

### 2. *Mr. Hernandez's Testimony*

Mr. Hernandez testified that, after Mr. Newman put a gun to his head, the Defendant went through his pockets. This is the only testimony by Mr. Hernandez with regard to the Defendant's purported involvement in the robbery. Mr. Hernandez does not say that the Defendant said anything to him. Mr. Hernandez does not say that the Defendant ever had possession of the gun. Mr. Hernandez does not say that the Defendant thwarted him or stopped him from exiting the vehicle.

While it is impossible to say precisely how much weight the jury placed on Mr. Hernandez's testimony, the Court can say that there is ample reason in the record to discount his testimony:

First, Mr. Hernandez had an obvious motivation to fabricate testimony and implicate the Defendant. He acknowledged that he was testifying in order to "clear charges" and avoid "being convicted" for having sold cocaine on three or four occasions to undercover officers. Tr. 68. The detective with whom Mr. Hernandez was working confirmed that Mr. Hernandez was cooperating in order to avoid prosecution on two or three cocaine distribution charges. Tr. 128.

Second, Mr. Hernandez acknowledged that he was trying to get the Defendant convicted. See Tr. 69-70:

> Q. So this would be the only trial that you are testifying to that you are trying to get a conviction on; is that correct?
>
> A. Yes.
>
> Q. And so this charge is from two-and-a-half years ago and you said charges, plural, they can still be brought back against you; correct?
>
> A. Yes.
>
> Q. And that is if you do not do things the way the police want you to do things; is that correct?
>
> A. I believe so.

See also Tr. 78:

> Q. Again, you are here with the intention of getting a conviction out of this so you do not get convicted yourself; is that correct?
>
> A. Yes.

Third, according to the testimony of Detective Smuck, Mr. Hernandez told the detective on the night of the attempted robbery that it was Mr. Newman who went through his pockets after he put a gun to his head. Tr. 135. Two days later, when Detective Smuck questioned him again, Mr. Hernandez again told him it was Mr. Newman who went through his pockets. Tr. 135. It was months before Mr. Hernandez told Detective Smuck that both Mr. Newman and the Defendant had gone through his pockets. Thus, the *only* witness to the only conduct demonstrating the Defendant's direct involvement in an attempted robbery twice attributed that conduct to another defendant and only implicated this Defendant months later.

Fourth, Detective Smuck testified that, when he questioned Mr. Hernandez as to why he had not told Detective Smuck earlier about the Defendant's going through his pockets, Mr. Hernandez told him he had

not remembered the Defendant going through his pockets because "he was under a lot of stress." Tr. 136-37. But when, earlier in the trial, this same line of questioning was posed to Mr. Hernandez, he claimed that he had promptly told Detective Smuck about the Defendant's going through his pockets and, in fact, claimed he questioned Detective Smuck as to why he had not put it into his police report. Tr. 77-78.

In short, this is a witness: (1) whose goal it was to obtain a conviction in order to avoid being convicted himself; (2) who twice attributed to another defendant the sole act that allegedly demonstrated this Defendant's involvement in the attempted robbery; and (3) whose testimony was impeached by the Commonwealth's own witness, Detective Smuck.

### 3. *Running Away*

There was no testimony at trial from a witness who observed the Defendant running from the scene of the crime. Detective Jared Lytle testified that Defendant's "exact words were to me that, `a big truck hit the car. I ran'," that his police report indicates that the Defendant said "when the cops hit the car, I ran," and that his notes indicate the Defendant said, "I knew what was going on when the cops hit the car, I ran." Tr. 90, 97, 105. The Defendant denied making this statement, stating that, "I never saw any cops ever. That wasn't a cop car that hit the car. It was a truck that hit the car." Tr. 206.

What is undisputed here is that the Defendant ran. But as the jury was instructed, "if a person leaves the place where a crime was committed, flees to avoid prosecution, or flees to avoid detection, apprehension, or arrest after the commission of the crime, this creates no presumption that the person is guilty of having committed the crime. However, it is a circumstance which you may consider along with all of the other evidence." Tr. 217.

The Defendant's testimony is that he was not involved in the attempted robbery and did not become aware of the fact that a robbery was underway until Mr. Newman put a gun to Mr. Hernandez's head. While one might argue that running from the scene undermines this claim of innocence, it can be argued that an individual who found himself caught up in what turned out to be an attempted armed robbery might run from the scene simply to avoid the possibility that someone might contend that he was, indeed, a participant in the planning and execution of the robbery.

### 4. *The Defendant's Statements to the Police*

The Court views the Defendant's statements to Detective Lytle as the most compelling and significant evidence against him. Not surprisingly, both defense counsel and the Commonwealth devoted much of their closing argument to addressing Detective Lytle's testimony.

This is what defense counsel said in closing argument with regard to Detective Lytle's testimony (Tr. 230-32):

> Now, nobody's saying Officer Lytle is lying. When I asked you in the beginning, do you think and do you believe or do you think it's unbelievable that a police officer could get something wrong and nobody shook their head no or responded to that which I'm assuming that that means that everybody here is keeping an open mind that somebody just because you're a police officer is not incapable of making a mistake. Now, we know that Detective Lytle made some mistakes just from what he was telling you. Because he said, "I don't record these things. Fifty interrogations before I went back to being a traffic officer, not one of them have I ever recorded." Well, that's pretty convenient because now you get to paraphrase what you heard in order to fit into any sort of preconceived notion that these four guys got out of that car, there's a robbery in the car, of course they're all guilty. So he spends 35 minutes with my client. He says did not record it and just jots down nine lines about what he heard. But he also heard — he told you, he also heard that my client said he was at a family gathering. Well, nobody but Detective Lytle thinks that that was true. They weren't at a family gathering. They were at Mr. Odem's house. At a party at Mr. Odem's house. So he did get something wrong. And he jotted down — when I say he, Detective Lytle jotted down that my client told him, "I knew a strong arm robbery was going to happen." Okay. Didn't put it down in his notes when he knew that. Said I knew it was going to happen. Well, my client knew that a robbery was going on and he knew it when the robbery started occurring, when the gun was brought out and seconds go by and, boom, they're yelling and screaming and the truck hits the car, that's when my client knew. That's when my client knew. It wasn't at a family get together and he knew about this robbery where the robbery happened. That's what he told Officer Lytle. Now, Officer Lytle had told you that it's not the policy of Fairfax County to record, that they don't have recorders available to use and I think you could use your common sense as to that. The richest county or one of the richest counties in the whole United States and a police force doesn't have access to a recorder, you can make your mind up about that. Use your common sense.

In rebuttal, this is what the Assistant Commonwealth's Attorney said with regard to Detective Lytle (Tr. 238-43):

Mr. Fields made several incriminating statements to Detective Lytle. Amongst them, he says that Mr. Odems came to them and said he was going to quote, "Get them some money. I knew they were going to strong arm someone. That we're going to show them a girl's bag and say the drugs were in that and then when the victim got in the car, we're going to rob them." "I honestly didn't know about the gun, man, I really messed up. This is serious. I knew what was going on when the cops hit the car." All of those are statements and quotes that Detective Lytle as he was taking his notes and he brought his notes that he had with him that day when he was interviewing Mr. Fields, that Mr. Fields said. And Mr. Fields tells you, everything that essentially is not incriminating, he was right, I said that. But every statement that was incriminating is wrong. Detective Lytle — and we're walking this thin line here — Detective Lytle is actually one of the most incompetent detectives around or a liar. It's one of two ways, that's what counsel's arguing to you. He either took such poor notes contemporaneously with the interview with Mr. Fields that every statement that he wrote down, Lord knows where that came from, or he's lying. Simply put, that's what they want you to believe. Detective Lytle who's been on the force for numerous years, who just happened to be the one who was asked to go and interview Lamar Fields. He had no history with this man. He didn't know who he was. All he knew was that, on April 19th, 2011, something severe and significant happened at the Silver Diner that involved a confidential informant. Does the Commonwealth want rabbis, priests, and ministers to be our witnesses in these type of cases? Absolutely. But we take what we have. There is no honor amongst thieves, no matter what people say. Thieves are out for their own welfare and they will do what they can to work for themselves. And that's why these detectives who are trained to deal with these individuals make an effort to make sure what they're being told is the truth and to confirm it. And that's what they did on this day. What is of note is that Mr. Fields says, all these incriminating statements are false, but what I want to point out is one thing. One of the last questions that I asked Mr. Fields was, "Were there a bunch of purses in the back of Ms. Tran's car?" "Oh, yeah. A lot." Detective Lytle wasn't at the scene. Detective Lytle wasn't in that car. How in the world would Detective Lytle write this quote, "We're going to show them the girl's bag and say the drugs were in that," unless he heard that from this man, because this man was in the car and this man saw the bags

in the car. And these were the individuals who were going through their imaginations of what they're going to say, how do I want to plan this out. Yes. Mr. Odems went to them and said, "You want to make some money? Come on with me. It's a lot of money." And, yes, in their car, they talked for 45 minutes about how they were going to do this. We'll say the drugs are in the car, in the bag. Yeah. Too complicated. Let's just rob him. We know that everything Mr. Hernandez says happens, true, up until the point that the Defendant disagrees with the fact that Mr. Hernandez says the Defendant went through his pants, too. Everything. The phone calls, the text messages, what happened in that car, the gun to the head, everything, except, again, when the evidence is there, that he was involved in this crime and he actively participated. If Detective Lytle is making this up or is wrong, wouldn't he have done just one simple thing and just said, he told me they were going to plan to rob the guy, that's it. Why would he mention — write something about a purse or something else? The reason why is because Lytle's not wrong in his notes that he took that day. Is Fairfax County a rich county, absolutely. Does Fairfax County stand out as one shining example in this country? Absolutely. But does that mean that every officer and every detective in Fairfax County has a recorder? No. Does that mean they probably should? Would we not have to deal with these issues that are raised every time, time and time again, if they would just record it? Absolutely. But we live with what we have and resources that we have. Detective Lytle was called in in his role, in his part, in the investigation to interview and he rolled in as soon as he can to talk with this person while the iron is hot, you sit him down, talk to them about what occurred and see what statements they make. And that's what he did. And those are the statements that are true. Those are the statements about what actually happened that day. Those are the statements that show that Mr. Fields wasn't an innocent bystander that sat in the back seat of an old Lexus car as a robbery went down. These are the statements of a man who actively participated with his compatriots in that car, discussing how they're going to rob Mr. Hernandez and what they were going to do afterwards. The Commonwealth asks you to find the Defendant guilty of this crime of attempted robbery because the facts show it. Because it is not reasonable to believe that Detective Lytle mistakenly wrote down bad notes.

Detective Lytle testified to several incriminating statements attributed to the Defendant, and the detective's notes and police report, which were

not admitted as exhibits but which were referenced at trial, corroborate the detective's testimony. The ultimate question is this, is Detective Lytle's testimony *by itself* enough? The Court uses the phrase "by itself" intentionally and advisedly. The only other potentially significant evidence offered by the Commonwealth in this trial was Mr. Hernandez's testimony that the Defendant went through his pockets. But this Court, in weighing the evidence as it is required to do under *Orndorff*, has no confidence in Mr. Hernandez's testimony, given the fact that he not only repeatedly attributed to a different defendant the sole evidence that directly ties this Defendant to participation in the crime but he also contradicted Detective Smuck as to when he first revealed this critical evidence.

More importantly, there is this, a jury could completely believe Detective Lytle — in other words, a jury could conclude that every statement attributed to the Defendant by Detective Lytle was actually made by the Defendant — and still find the Defendant not guilty. This is because Detective Lytle never indicated that the Defendant made any statement admitting that he did something tangible to further the commission of the attempted robbery. While Mr. Hernandez claims that he told Detective Smuck on the night of the incident that the Defendant had gone through his pockets, there is nothing in Detective Lytle's testimony to indicate that the Defendant admitted to doing this or was even questioned about it. Nor did the Defendant tell Detective Lytle that he spoke to Mr. Hernandez, handled the gun, or did anything other than remain seated in the back seat. If the jury disbelieved Mr. Hernandez's testimony that the Defendant went through his pockets, the only arguable "conduct" that could be attributed to the Defendant was that he remained seated in the back seat. While the Commonwealth certainly argued that this was enough,[2] a jury might well conclude that the passive act of remaining seated in a back seat was not enough to convict an individual of attempted robbery, *even if that individual acknowledged to police that he had become aware that a robbery was to take place.*

See generally, *Hood v. Commonwealth*, 269 Va. 176, 182-83, 608 S.E.2d 913 (2005) (citations omitted) ("A person is guilty as a principal in the second degree if he is present and assists the perpetrator of the crime or shared the perpetrator's intent to commit the crime."); *Bass v. Commonwealth*, 31 Va. App. 373, 389, 523 S.E.2d 534 (2000) (citations omitted) ("[T]he accused's mere presence and consent to the crime will not suffice to convict as an accomplice."); *McGill v. Commonwealth*, 24 Va. App. 728, 733, 485 S.E.2d 173 (1997) (citation omitted) ("To hold an accused accountable as a principal in the second degree, the Commonwealth must show that the accused was present, aiding and abetting, and intended his or her words,

---

[2] See this excerpt from the Commonwealth's closing argument: "And we know Mr. Fields sat there and prevented Mr. Hernandez from being able to escape outside the other way away from that handgun pointed to his head. He had nowhere to go. He was playing his role." Tr. 224.

gestures, signals, or actions to in some way encourage, advise, urge, or in some way help the person committing the crime to commit it."); *Hyde v. Commonwealth*, 217 Va. 950, 956, 234 S.E.2d 74 (1977) (citation omitted; internal quotation marks omitted) (holding that to find an individual to be an aider and abettor, "[t]here must be something done or said by him showing (a) his consent to the felonious purpose and (b) his contribution to its execution").

Finally, the Court would note this salient fact, this case was tried twice. The case was first tried in November 2012. The Defendant was the same, the Commonwealth's witnesses were the same, the defense witnesses were the same, and the counsel for both sides were the same. At each trial, the Commonwealth called Anthony Hernandez, Detective Lytle, and Detective Smuck. At each trial, the defense called Vivian Tran, Devon Jackson, and the Defendant. The result was a hung jury. That is some indication that the evidence was far from overwhelming.

If Detective Lytle's testimony was combined with any other compelling evidence of guilt, the Court might well conclude that the new evidence does not warrant a new trial. Detective Lytle's testimony, however, was *not* accompanied by any other compelling evidence of guilt, and given the fact that a jury could have believed Detective Lytle and still acquitted the Defendant, the Court concludes that had the jury *also* heard the exculpatory testimony of Mr. Odems, it would have led to a different outcome, significantly, an acquittal. Therefore, the Court sets aside the verdict of guilty and the sentence imposed thereon and orders a new trial. The matter is set for a status hearing in accordance with the attached order.

## Order

Before the Court is the Defendant's motion to set aside the verdict in this case. For the reasons set forth in the Letter Opinion issued today, the Court grants the Defendant's motion, sets aside the verdict, and orders a new trial, to be heard by this Court. The Court further orders that this case be set on April 23, 2014, at 9:30 a.m., for a status hearing before this Court to schedule a trial date.