Present:  All the Justices

STEPHEN JAMES HOOD

v.  Record No. 040774     OPINION BY JUSTICE ELIZABETH B. LACY
                                      March 3, 2005
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Stephen James Hood was convicted of first-degree murder as a principal in the second degree.  Hood asks this Court to reverse his conviction, asserting that the trial court erred in allowing the Commonwealth to use statements Hood made in a proffer submitted to the government in the course of plea negotiations.  The proffer agreement provided that the proffered statements could be used against Hood if he offered testimony or presented evidence that was different from any statement or information provided in the proffer.  We conclude that because Hood's evidence at trial was inconsistent with his proffered statement, the trial court did not err in allowing the Commonwealth to use the proffered statement.

Facts and Proceedings

The facts, as relevant to the issues in this appeal, are not in dispute.  Early in the morning of August 31, 1990, Eloise Cooper, an elderly African-American woman, was abducted from the apartment she shared with her husband.  That afternoon her body was found in the woods of a nearby park.  According to the medical examiner, Mrs. Cooper had suffered three stab wounds,

two of which perforated vital organs and caused her to bleed to death.

Although a third party was convicted of the murder in 1991, the police reopened the case in 1999, at which time Hood and another individual, Billy Madison, were developed as suspects in Mrs. Cooper's murder. Hood was indicted on May 17, 2001 for first degree murder, in violation of Code § 18.2-32, and abduction, in violation of Code § 18.2-47. As part of plea negotiations, Hood and the government agreed that he would provide a "detailed oral proffer" and that none of the statements made in the proffer would be used against Hood in the Commonwealth's case-in-chief in a criminal prosecution of Hood. The agreement further provided that if Hood "offers testimony or presents evidence different from any statement made or other information provided during the proffer," the Commonwealth could use his statements for impeachment, cross-examination, and rebuttal.

Hood's oral proffer was taken over the course of three days and was reduced to 17 typed pages. In his proffer, Hood stated that he and Madison engaged in a number of drug transactions with Roberto Steadman in the summer of 1990. Shortly before the day of the murder, Madison had given Steadman money to purchase drugs, but Steadman failed to deliver the drugs to Madison or return Madison's money. In

response, Madison took Steadman's bicycle and put it in Hood's apartment.  When Steadman recovered the bicycle from Hood's apartment, Madison was angry and said he was going to "get his drugs or get this thing straight."

Madison went to Hood's apartment during the early morning hours the day of the murder.  Madison called Steadman from Hood's apartment and arranged to meet Steadman to get some drugs.  Suggesting that they should not go to the drug deal unarmed, Hood took three knives he obtained while working as a chef.  Hood did not want to take his truck because it was "so noisy."  Madison had access to a "quieter" car, and Hood drove that car to meet Steadman.

The two men picked up Steadman and took him to his apartment.  Shortly after Steadman went into his apartment, Madison got out of the car and walked toward the apartment. According to Hood, when Madison returned to the car, he was "mad."  Madison took Hood's knives and again walked away from the car.

Madison returned in a few moments with an elderly African-American woman in a nightgown.  Madison "threw" the woman into the back seat of the car and got in on top of her. The woman was screaming and crying.  Madison, pointing one of the knives at the woman and at Hood, told Hood to drive to a "dark place."  After driving around for a short while, Hood

3

stopped the car on a dark street.  Madison and the woman got out of the car and walked a short distance.  Hood stated that it looked like Madison was hitting the woman and that the woman's crying eventually stopped.  Madison returned to the car with Hood's knife still in his hand, and directed Hood to return to Madison's apartment.  Madison got out of the car, took Hood's knife, and returned to his apartment.  Hood took the rest of the knives and returned to his apartment.

Sometime later, Hood refused to testify as a character witness for Madison.  Madison told Hood that if Hood did not testify he would kill Hood "just like" he killed the woman.  Madison also threatened to harm Hood's daughter and the mother of his daughter.

At trial, the Commonwealth agreed that, under the terms of the proffer agreement, it could not use Hood's proffered statements unless Hood presented evidence inconsistent with those statements.  During the course of the Commonwealth's case, the state medical examiner was asked to describe the condition of the victim at the crime scene.  The medical examiner answered that the victim's pajama bottoms were off, her pajama top was open and pulled up, and her legs were "spread eagle."  Under these circumstances, the medical examiner explained that the crime would be treated as a "sex crime;" however, the laboratory tests "were negative for

sperm."  On cross-examination, Hood's counsel asked the medical examiner if she recalled whether during the same time period "there were several other elderly African-American women who were found stabbed to death."  The Commonwealth objected to this question as beyond the scope of its direct examination.  Hood's counsel suggested that the Commonwealth could cross-examine the witness and was permitted to elicit testimony from the medical examiner about other murders of elderly women who had been beaten and sexually assaulted around the same time as the instant crime.

Before resting its case, the Commonwealth sought to introduce Hood's proffered statements through the investigating officer, arguing that the testimony from the medical examiner presented by Hood regarding the similarity of murders of other elderly women to the murder in this case was contrary to the statements in the proffer and, therefore, the Commonwealth was entitled to use the proffered statement against Hood.  Hood argued that the medical examiner's testimony was not contrary to Hood's proffer.  The court concluded that the testimony of the medical examiner presented by Hood indicating that the murder of Mrs. Cooper "could have been related to the Golden Years Murders" was different from Hood's proffered statements and, therefore, the Commonwealth was entitled to introduce those statements.

5

The trial court found Hood guilty of murder and abduction as a principal in the second degree. The trial court, after further briefing and argument of counsel, denied Hood's motion to reconsider the admission of his proffered statement, finding that Hood had presented "circumstantial evidence which was different from" the proffered statements. The trial court also rejected Hood's arguments that the evidence was insufficient to support his conviction. In an unpublished memorandum opinion, a divided panel of the Court of Appeals affirmed the judgment of the trial court convicting Hood of the murder as a principal in the second degree.[1] Hood v. Commonwealth, Record No. 2469-02-2 (February 17, 2004).

## Discussion

We have not previously considered the type of agreement, described as an "immunity/cooperation" agreement, at issue here. Neither party questions the legality or enforceability of the proffer agreement and the agreement is not inconsistent with the provisions of Rule 3A:8.[2] We first note that these "cooperation/immunity" agreements, are markedly different from

---

[1] Hood's abduction conviction was not before the Court of Appeals and is not before this Court.

[2] The proffer agreement is consistent with the provisions of Rule 3A:8(c)(5) that prohibit such statements from being admitted in the Commonwealth's case-in-chief because it contained such a prohibition and allowed the statements to be admitted only for cross-examination, rebuttal or impeachment.

6

plea agreements.  These agreements, unlike plea agreements, involve only the contracting parties and are not subject to the filing and acceptance procedures applicable to plea agreements.  See Rule 3A:8.  Compare Commonwealth v. Sandy, 257 Va. 87, 509 S.E.2d 492 (1999).  Nevertheless, there are similarities between plea agreements and the agreement at issue in this case.  The Court of Appeals and other courts that have considered such agreements have uniformly held that these cooperation/immunity agreements, like a plea agreement, implicate a defendant's due process rights and are generally governed by the law of contracts.  Lampkins v. Commonwealth, ___ Va. App. ___, ___, 607 S.E.2d 722, ___ (2005); Commonwealth v. Sluss, 14 Va. App. 601, 604, 419 S.E.2d 263, 265 (1992); Plaster v. United States, 789 F.2d 289, 293 (4th Cir. 1986).  On appellate review, the trial court's interpretation of the agreement is a matter of law subject to de novo review, while a clearly erroneous standard of review is applied to the trial court's factual findings.  Sluss, 14 Va. App. at 606-07, 419 S.E.2d at 266-67; United States v. Smith, 976 F.2d 861, 863 (4th Cir. 1992); United States v. Conner, 930 F.2d 1073, 1076 (4th Cir. 1991).  We will apply these standards of review in this case.

---

Hood raised no objection to the manner in which the evidence at issue was used by the Commonwealth.

At trial neither party suggested that the proffer agreement was ambiguous, and the trial court was not called upon to interpret the agreement. In his brief to this Court, Hood asserts that the "terms and conditions of the proffer agreement are not contested." Although the record does not reflect any dispute over the meaning of terms in the proffer agreement, the record does show that neither the parties nor the trial court considered or asserted that the phrase "different from" meant simply "in addition to." Rather both parties suggested that evidence contrary to, or inconsistent with, the proffered statement would violate the terms of the proffer. Thus, in this case we consider the phrase "different from" in the same manner.

The trial court concluded that the testimony of the medical examiner presented by Hood was circumstantial evidence regarding the commission of the murder and was different from that contained in the proffered statement. Whether Hood breached the agreement is a question of fact which we review under a clearly erroneous standard.

Hood argues that the evidence elicited from the medical examiner regarding the stabbing murders of other elderly women was not different from his proffered statement. At trial Hood asserted that the "crux of [his] statement is this, that he was present and that he knew who did it." On brief in this

Court, Hood agrees that evidence showing that someone other than Madison committed the crime would "have constituted presenting evidence different from his statement."

The Commonwealth argues that the testimony elicited by Hood from the medical examiner created an inference that a person other than Madison murdered Mrs. Cooper. This inference arises from the testimony regarding the stabbing murders of a number of elderly women during the same time period. The trial court agreed, stating that this evidence implied that the murder of Mrs. Cooper was related to the "Golden Years" cases, a name given the murders of the other elderly women. The trial court concluded that this circumstantial evidence created an inference that someone other than Madison murdered Mrs. Cooper and that this inference was inconsistent with Hood's proffer that Madison killed Mrs. Cooper.[3]

Based on this record, we cannot say that the trial court clearly erred in concluding that the evidence presented by Hood created an inference that Mrs. Cooper's murderer was someone other than Madison and that the introduction of such evidence was different from the proffer statement that

---

[3] As noted by the dissenting judge in the Court of Appeals, the trial court's initial statement that the evidence was inconsistent with Hood's statement that he committed the

9

attributed the murder to Madison.  Accordingly, for the reasons stated, we will affirm the judgment of the Court of Appeals holding that the trial court's admission of Hood's proffered statement was not error.

We also will affirm the judgment of the Court of Appeals that the evidence supported Hood's conviction for first degree murder as a principal in the second degree.  A murder committed in the course of an abduction is first degree murder.  Code § 18.2-32.  A person is guilty as a principal in the second degree if he is present and assists the perpetrator of the crime or shared the perpetrator's intent to commit the crime.  Jones v. Commonwealth,  208 Va. 370, 372-73, 157 S.E.2d 907, 909 (1967); Snyder v. Commonwealth, 202 Va. 1009, 1015, 121 S.E.2d 452, 457 (1961).  Hood argues that there is no evidence that he engaged in any overt act to further the murder.  However, the evidence, viewed in the light most favorable to the Commonwealth, Dowden v. Commonwealth, 260 Va. 459, 461, 536 S.E.2d 437, 438 (2000), proved that when Hood left his apartment with Madison he knew that something "was going to happen when they met with Steadman that night."  The evidence further showed that Hood provided the knives, and that he, at Madison's direction, drove Madison and Mrs. Cooper

crime was erroneous.  This error, however, does not affect our analysis.

10

to a secluded area where they would not be detected and then drove Madison away from the crime scene.  This evidence is sufficient to sustain a finding that Hood was present and assisted Madison in the murder of Mrs. Cooper.

For the above reasons, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.