PRESENT:  All the Justices

JOHN CRIDLER-SMITH

v.  Record No. 230450

HAROLD CLARKE, DIRECTOR OF THE
DEPARTMENT OF CORRECTIONS

OPINION BY
JUSTICE WESLEY G. RUSSELL, JR.
JANUARY 16, 2025

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Stephen E. Sincavage, Judge

John Cridler-Smith appeals a judgment of the circuit court denying his petition for a writ

of habeas corpus.  In his petition, Cridler-Smith asserts two claims for ineffective assistance of

counsel.  Specifically, he challenges his pre-trial counsel's advice to cooperate with law

enforcement absent adequate investigation into the matter and his trial counsel's subsequent

failure to move to suppress the resulting incriminating statements he made.[1]  For the reasons that

follow, we reverse the judgment of the circuit court and remand the matter for further

proceedings consistent with this opinion.

I.  Background

The petition for a writ of habeas corpus underlying this appeal stems from Cridler-

Smith's criminal conviction in 2017 for possession with the intent to distribute more than five

pounds of marijuana.

On April 23, 2015, a United States postal worker in Loudoun County observed a

suspicious, heavily-taped parcel that had been mailed from Arcadia, California.  Cridler-Smith

---

[1] Cridler-Smith was represented by different attorneys—one attorney during initial pretrial proceedings and a different attorney at the trial stage.  Although his complaint argues each was ineffective during his respective period of representation, the identity of the attorney who Cridler-Smith alleges was ineffective is immaterial to our resolution of Cridler-Smith's claims.  Accordingly, for ease of reference, we refer to each simply as "counsel."

was a resident of Arcadia, California. At the time, California was known to be a "source state" for marijuana trafficking. After a specially trained canine detected the possible scent of drugs, law enforcement obtained a search warrant and found 6.44 pounds of what appeared to be marijuana inside the parcel.

The following day, officers conducted a controlled delivery of the parcel to its intended destination. The home was Cridler-Smith's brother's residence. An undercover postal inspector delivered the parcel to the front of the residence. About 15 minutes later, Cridler-Smith approached the residence in a black SUV, parked in front of the residence, and walked toward the front door. Within minutes, a rapid response unit entered the residence and brought everyone outside. Although no one testified to seeing Cridler-Smith handle the parcel or enter the residence, he was seen by several officers outside after the rapid response unit cleared the building, and the parcel had been brought inside the residence before the building was cleared.

Upon searching the residence, officers found a vacuum sealer, bags, packaging tape, rolling papers, grinders with green plantlike material in them, a glass smoking device with plantlike residue in it, the parcel delivered in the controlled delivery, and another similarly sized and taped parcel addressed to the same individual as the controlled-delivery parcel. Both parcels were sent for forensic analysis, which confirmed they contained over 144 ounces of marijuana in heat-sealed bags. An expert testified that the state of the parcels and the amount of contraband contained therein was not consistent with personal use, but rather, was indicative of distribution.

Cridler-Smith was arrested and jailed. Shortly thereafter, Cridler-Smith met with counsel. At the outset of the representation, Cridler-Smith detailed that his primary objectives were (1) to protect his brother and (2) to get out of jail as soon as possible. Given the nature of the charges and Cridler-Smith's background, including that he was from California, counsel

2

concluded that the circuit court "was likely to consider [Cridler-Smith's] risk of flight substantial[,]" and therefore, "[b]ond was not likely to be reasonably set in this case[.]" As a result of this conclusion, counsel advised Cridler-Smith "that the best chances of achieving both of his major interests quickly [was] through cooperation with law enforcement." According to counsel, he advised Cridler-Smith that cooperating with law enforcement always came with risk and that agreeing to cooperate would not "guarantee[]" an "offer" from the Commonwealth to resolve the case.

Cridler-Smith's counsel discussed Cridler-Smith's potential cooperation with the Commonwealth. Counsel was told that the Commonwealth "would not agree to enter into a *written* agreement other than an agreement to bond and discussion regarding protecting Mr. Cridler-Smith's brother, as well as a promise of his cooperation factoring into whatever offer is extended in the future to resolve the charges against Mr. Cridler-Smith." According to counsel, the Commonwealth "indicated a written agreement would be negotiable after they assess[ed] the value of . . . Cridler-Smith's cooperation[,]" if any.

As a result of his choice to cooperate, Cridler-Smith was interviewed by law enforcement on April 29, 2015. Detective Chris Staub conducted the interview at the jail. In the course of the interview, Cridler-Smith admitted that he had shipped nine pounds of marijuana to his brother's house. The admission was significant because Detective Staub had not disclosed any information about the recovered parcels or their contents to Cridler-Smith prior to this admission. Cridler-Smith also told Detective Staub that he had instructed his brother not to open the packages and that his brother was not involved with the marijuana or Cridler-Smith's activities. Additionally, according to Detective Staub, Cridler-Smith said that he was $21,000 in debt, that

he resided in California at that time, and that he sent the marijuana through the mail to Virginia to "set up buyers for the upcoming season."

As a result of the interview, the Commonwealth and Cridler-Smith entered into a consent order that the parties have characterized as a cooperation bond. The consent order, which was entered by the circuit court on April 30, 2015, "released [Cridler-Smith] on a $5,000 secured bond" subject to certain conditions, including reporting requirements, Cridler-Smith remaining in Virginia, and Cridler-Smith's continued cooperation with law enforcement. As a result, Cridler-Smith was released from jail approximately a week after his arrest.

Ultimately, the Commonwealth did not find the cooperation that Cridler-Smith provided to be of sufficient value to warrant dismissing the case against him or resolving it by way of a plea agreement. The matter proceeded to trial. At trial, the Commonwealth's case relied heavily if not almost entirely on Cridler-Smith's confession during his interview with Detective Staub. Defense counsel did not move to suppress or otherwise object to the use or introduction of Cridler-Smith's incriminating statements to Detective Staub. Cridler-Smith was found guilty of possession with the intent to distribute more than five pounds of marijuana and sentenced to twelve years' incarceration.

Cridler-Smith sought to appeal his convictions, arguing that the "'evidence was insufficient to prove [he] exercised dominion and control'" over the marijuana found at his brother's residence. His direct appeals were unsuccessful.

Subsequently, Cridler-Smith, proceeding pro se, filed a petition for a writ of habeas corpus in the Loudoun County Circuit Court asserting ineffective assistance of counsel. As pertinent to this appeal, Cridler-Smith argued that, in the period immediately after his arrest, counsel erroneously advised him to cooperate with law enforcement without first fulfilling his

4

duty to investigate the circumstances of the case. Regarding counsel's performance at trial, Cridler-Smith claimed that counsel erroneously failed to move to suppress his confession, which Cridler-Smith contends was inadmissible pursuant to Rule 3A:8(c)(6) of the Rules of this Court. In response, the Director of the Department of Corrections (the "Director") filed a motion to dismiss, arguing that "Cridler-Smith is not entitled to relief . . . because he has not met his demanding burden under *Strickland v. Washington,* 466 U.S. 668 (1984)."

Proceeding without a hearing, the circuit court initially granted the Director's motion to dismiss in part and denied the motion in part. Regarding the ineffective assistance claims that are the subject of this appeal, the circuit court first denied the claim regarding counsel's initial pretrial conduct. Specifically, the circuit court found that counsel's advice regarding cooperation "was tailored to [Cridler-Smith]'s stated objectives, to protect his brother and minimize jail time, and included a warning that cooperation might not yield the result he wanted."[2] As a result, the circuit court found that Cridler-Smith had not shown that counsel's "advice to cooperate with law enforcement or failure to negotiate an immunity agreement [was] unreasonable."

Although it granted a majority of the Director's motion to dismiss, the circuit court initially did not dismiss Cridler-Smith's claim that counsel was ineffective for failing to seek to suppress his confession to Detective Staub. After discussing the potential scope of Rule 3A:8(c)(6), the circuit court noted that "the record reflects that the parties were quasi-negotiating a plea agreement at the time of [Cridler-Smith]'s statement[s]" to Detective Staub, and that "[i]t is reasonable to characterize [Cridler-Smith]'s statements as made in connection

---

[2] The circuit court further found that Cridler-Smith did receive a benefit as a result of his cooperation because "he was released on bond pending trial." This finding lends credence to counsel's belief that, absent cooperation, Cridler-Smith was unlikely to have received bond pending trial.

with an offer to plead guilty." Although the circuit court stopped short of finding, as a matter of fact, that Cridler-Smith's statements fell within the scope of Rule 3A:8(c)(6), it recognized the significance of such a conclusion, noting that "[t]here is a reasonable probability, that, without the confession, the Commonwealth would not have proved its case, and [Cridler-Smith] would not have been convicted. This constitutes prejudice under *Strickland*." As a result, the circuit court concluded that Cridler-Smith had stated a claim by sufficiently alleging "deficient performance and prejudice for [counsel]'s failure to file a motion to suppress his confession based on Supreme Court of Virginia Rule 3A:8(c)(6)." The circuit court, however, concluded that, although Cridler-Smith had stated a claim, the claim could not be fully resolved because "the record does not adequately resolve these issues[.]" Accordingly, the circuit court determined that, on this particular claim, the matter would "proceed to a hearing."

In response, the Director filed a motion seeking to have the circuit court reconsider its ruling that Cridler-Smith had stated a potentially viable habeas claim and that an evidentiary hearing was necessary to resolve that claim. In effect, the Director argued that the record established that Cridler-Smith's confession to Detective Staub did not fall within the scope of Rule 3A:8(c)(6) and that, even if it could be argued that it did, the argument was sufficiently novel that counsel was not ineffective for failing to raise it. Cridler-Smith, still proceeding pro se, filed a response to the Director's motion to reconsider.

Without convening a hearing, the circuit court granted the Director's motion to reconsider and dismissed Cridler-Smith's claims. In doing so, the circuit court neither expressly revisited its prior conclusion that "[i]t [was] reasonable to characterize [Cridler-Smith]'s statements as made in connection with an offer to plead guilty[,]" nor did it definitively determine whether, as a factual matter, Cridler-Smith's statements fell within the scope of Rule

6

3A:8(c)(6). Rather, it determined that it could identify objective reasons that a competent attorney, even if in error, could have concluded that the statements to Detective Straub fell outside the scope of Rule 3A:8(c)(6). Accordingly, the circuit court dismissed Cridler-Smith's habeas petition in its entirety, and Cridler-Smith appealed to this Court.

## II. Analysis

### A. Standard of review

When, "as in this case, the habeas court dismissed the petition based upon a review of the pleadings without an evidentiary hearing, we review the decision to dismiss the petition de novo." *Zemene v. Clarke*, 289 Va. 303, 307 (2015). Although, in general, most "habeas claims can be resolved solely on the recorded matters[,]"[3] when a petitioner's entitlement to relief turns upon a disputed question of material fact, "a circuit court should receive additional evidence and decide any genuine issues of material fact." *Smith v. Brown*, 291 Va. 260, 264 (2016). If resolution of such a disputed fact is necessary for us to conduct our review, remand to the circuit court to resolve the factual dispute is appropriate. *Id*. at 268.

### B. The *Strickland* standard

We review ineffective assistance of counsel claims under the familiar two-pronged test set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To be entitled to habeas relief under *Strickland*, a petitioner must demonstrate both that counsel's performance was constitutionally deficient (the "performance prong") and that the petitioner

---

[3] In habeas proceedings, "recorded matters" are not limited to the record in the underlying trial. Code § 8.01-660 provides that "[i]n the discretion of the court or judge before whom the petitioner is brought, the affidavits of witnesses taken by either party, on reasonable notice to the other, may be read as evidence." Accordingly, such affidavits may be considered without a habeas court being required to conduct an evidentiary hearing.

suffered constitutionally cognizable prejudice as a result (the "prejudice prong"). 466 U.S. at 687. If a petitioner fails to make either showing, he is not entitled to habeas relief. *Id.*

1. The performance prong

To satisfy *Strickland*'s performance prong, a petitioner must demonstrate "that counsel's performance was deficient[,]" that is, "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [a] defendant by the Sixth Amendment." *Id.* This is a heavy burden as courts reviewing ineffective assistance claims must "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Furthermore, the review is conducted without the benefit of hindsight, but rather, on the situation faced by counsel at the time his decisions were made. *Id.* at 689. Thus, the fact that hindsight may demonstrate that the strategy pursued ultimately was unsuccessful or that some other course of action may have been preferred does not dictate a conclusion that counsel's performance was constitutionally ineffective. *Id.*

In applying this deferential standard, we consistently have recognized that it does not permit us to second-guess reasonable strategic decisions made during the course of an attorney's representation. *See*, *e.g.*, *Prieto v. Warden of the Sussex I State Prison*, 286 Va. 99, 108-09 (2013); *Morva v. Warden of the Sussex I State Prison*, 285 Va. 511, 516 (2013). We note, however, that merely labeling a decision as "strategy" does not render it a reasonable strategic choice immune from habeas review. A decision is not strategic simply because it was made; rather a reasonable strategic decision is one that flows from the known facts and circumstances and takes account of the likelihood of success weighed against other potential strategies and the effect the choice has on the overall conduct of a case, i.e., whether adopting a particular strategy forecloses other options that might be pursued.

8

Reviewing courts must recognize that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89. Thus, what might be an unreasonable choice in one case, may be a reasonable one in another. For example, a high-risk strategy with a low probability of success might be reasonable in circumstances where, because of the facts, counsel's options are limited to choosing between less-than-ideal strategies.

Habeas courts must be mindful that criminal defense is not practiced out of a cookbook. Reasonable counsel can, and often do, disagree about what would be the best way to defend a particular case, and the existence of such disagreements does not suggest that choosing an alternative strategy is constitutionally unreasonable. As the Court in *Strickland* itself recognized, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Thus, in evaluating an ineffective assistance claim, the question before a habeas court is not whether some, many, or even most reasonable criminal defense counsel would have employed a particular strategy or made a particular choice, but rather, whether a reasonable defense attorney under the specific facts and circumstances *could* have employed the strategy or made the choice at issue.

In making that determination, a reviewing court does not consider what actually motivated counsel to undertake a particular strategy as counsel's subjective reasons and thoughts are irrelevant to the inquiry. "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). Thus, to satisfy the performance prong of *Strickland*, a

9

petitioner must establish that an objective review of the challenged choice or strategy leads to the conclusion that no reasonable attorney could have made the choice or employed the strategy under the facts and circumstances of the particular case.

## 2. The prejudice prong

To satisfy *Strickland*'s prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." 466 U.S. at 693. Rather, to be entitled to relief, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Under this standard, a petitioner must demonstrate more than a mere possibility that the outcome would have been different, but need not prove that the result definitely would have been different. Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. In deciding whether a petitioner has carried this burden, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury" and how the asserted errors likely would have affected the consideration of that admixture of evidence, both what was considered (or should have been considered) and how a reasonable factfinder would have weighed the totality of the evidence without the errors. *Id.* at 695-96.

## C. Counsel's initial advice regarding cooperation did not constitute deficient performance under *Strickland*

In his first assignment of error, Cridler-Smith asserts that his counsel was ineffective in advising him to cooperate with law enforcement even though doing so advanced Cridler-Smith's stated objectives. Specifically, he contends that counsel did not sufficiently investigate the case before rendering the advice and that "[w]ithout an independent investigation apart from [Cridler-Smith's] stated objectives," the advice "was deficient." We disagree.

10

Although criminal defense counsel is granted significant latitude in determining the strategies to be employed in attempting to achieve a client's objectives, certain matters are for the client to decide. *Florida v. Nixon*, 543 U.S. 175, 187 (2004). In general, it is for a client to determine the objectives his lawyer should pursue. *See* Rule 1.2(a) of the Rules of Professional Conduct (providing that, subject to certain exceptions not relevant here, "[a] lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued"). So long as the client's objectives are lawful and legitimate, counsel should attempt to devise a strategy to achieve those objectives.

It is undisputed that, at the outset of the representation, Cridler-Smith instructed counsel that his primary objectives were protecting his brother and seeking his immediate release from jail. Both are lawful and legitimate objectives, and we have little difficulty imagining scenarios where these would be a defendant's objectives, especially if, as Cridler-Smith claimed, his brother was an innocent bystander to Cridler-Smith's drug distribution scheme.[4] Thus, it was certainly appropriate for, if not incumbent upon, counsel to craft a strategy that sought to advance Cridler-Smith's objectives.

Knowing these objectives and having learned Cridler-Smith's version of events from Cridler-Smith himself, counsel crafted a strategy to advance these objectives. Cridler-Smith's admitted involvement in a significant, multistate drug distribution scheme and his potential as a flight risk given that he was a California resident caused counsel reasonably to conclude that he was not a candidate for pretrial release absent cooperation with the Commonwealth. Although we conclude that such a conclusion was reasonable when counsel initially made it, subsequent

---

[4] Ultimately, the analysis does not change even if the brother was involved in the scheme. Regardless of the brother's involvement, Cridler-Smith's desire to protect his brother was a reasonable objective to be pursued.

events further demonstrate that it was correct. Cridler-Smith was released pretrial with the circuit court finding that Cridler-Smith "did in fact receive[] a bond based on that cooperation." This strongly suggests that counsel was correct that, absent cooperation, Cridler-Smith was unlikely to receive bond pending trial. Accordingly, the strategy was not only a reasonable one in light of the stated objective, it was necessary to achieve it.

Similarly, the advice that cooperating with law enforcement was Cridler-Smith's best option if he wanted to try to help his brother clearly was reasonable. Given that large quantities of drugs had been sent to the brother's house on multiple occasions and law enforcement's search of the house had led to the discovery of equipment often associated with drug distribution activities, Cridler-Smith's brother was all but certain to be considered a suspect by law enforcement. It was reasonable for counsel to conclude that law enforcement would not even consider, let alone accept, claims that the brother was not involved from someone who also did not admit to being involved in the scheme. After all, only someone aware of and involved in the scheme would have the knowledge necessary to credibly maintain that the brother was not involved. Given the information about his involvement that Cridler-Smith provided counsel and Cridler-Smith's stated objective to help his brother, a recommendation that Cridler-Smith cooperate was a reasonable strategy decision.

In his assignment of error, Cridler-Smith largely recognizes that counsel's strategy regarding cooperation was consistent with his stated objectives; however, he contends it still constituted deficient performance because the advice was given without undertaking additional investigation. We disagree.

As a general matter, a criminal defense attorney, like any other attorney, has a duty to investigate his client's case and formulate his recommendations based on that investigation. It

does not follow, however, that competent counsel must investigate every possible theory that one can imagine before rendering competent advice. "[S]trategic choices made after less than complete investigation are reasonable . . . to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Thus, "counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691 (emphasis added). Evaluating whether a decision to forgo pursuing additional investigation was reasonable requires consideration of the totality of the circumstances with a heavy emphasis on what a criminal defendant has communicated directly to counsel. As the Court explained in *Strickland*:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id*.

Here, a review of the circumstances demonstrates that counsel's decision to render advice without additional investigation was reasonable. From the initial interview of Cridler-Smith, counsel was aware of his involvement in the drug distribution scheme and that, given the circumstances, Cridler-Smith was not a candidate for pretrial release absent offering his cooperation. Further investigation would not have altered these basic facts and would not have provided any additional information that would have assisted in achieving Cridler-Smith's

13

objectives: immediate release and assisting his brother's cause.[5]  In fact, to the extent that further

investigation delayed or eliminated the opportunity to offer cooperation, pursuing additional

investigation very well may have hindered counsel's efforts to achieve Cridler-Smith's

objectives.  Accordingly, the decision not to conduct further investigation before rendering the

advice regarding cooperation was reasonable.

Given the foregoing, Cridler-Smith has failed to demonstrate that counsel's initial advice

regarding cooperation constituted deficient performance under *Strickland*.  Accordingly, he has

failed to meet his burden to establish ineffective assistance of counsel regarding this claim.[6]

D.  Counsel's failure to seek suppression of Cridler-Smith's statements to Detective Staub may
     have constituted ineffective assistance

Cridler-Smith next contends that trial counsel's failure to move, pursuant to Rule

3A:8(c)(6), to suppress his confession to Detective Staub constituted ineffective assistance of

counsel under *Strickland*.[7]  We find that Cridler-Smith's allegations in this regard set forth a

plausible claim of ineffective assistance; however, deciding the claim requires resolution of a

---

[5] We note that at no point has Cridler-Smith even speculated as to what facts additional investigation might have uncovered that would have assisted counsel in attempting to achieve Cridler-Smith's stated objectives by some other means.

[6] Because we conclude that Cridler-Smith did not carry his burden on *Strickland*'s performance prong, we do not address the prejudice prong as it relates to this claim.  *Strickland*, 466 U.S. at 697.

[7] It is a prosecutor and not a law enforcement officer who makes the decision as to whether the Commonwealth will enter into discussions that ultimately might result in a plea agreement.  Accordingly, in the ordinary course, Rule 3A:8(c)(6) will be inapplicable to discussions between law enforcement officers and defendants.  Here, however, Detective Staub's jailhouse interview of Cridler-Smith was the direct result of discussions between Cridler-Smith's counsel and the prosecutor and was for the explicit purpose of determining what information and level of cooperation Cridler-Smith was willing to provide the Commonwealth.  As a result of the prosecutor's involvement, Rule 3A:8(c)(6) potentially was applicable to Detective Staub's interview.

14

disputed question of material fact that the circuit court did not resolve definitively on this record. Accordingly, for the reasons that follow, we reverse the judgment of the circuit court and remand the matter for further proceedings consistent with this opinion.

1.  Rule 3A:8(c)(6)

Rule 3A:8(c)(6) addresses specific circumstances in which statements made by criminal defendants may not be used in a subsequent trial.  In pertinent part, it provides that

> [e]xcept as otherwise provided by law, *evidence* of a plea of guilty later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged, or any other crime, or *of statements made in connection with and relevant to any of the foregoing pleas or offers, is not admissible in the case-in-chief in any civil or criminal proceeding against the person who made the plea or offer*.

(Emphases added).  Thus, contrary to the general rule that anything that an arrestee or defendant says to law enforcement can and will be held against him in a court of law, Rule 3A:8(c)(6) prohibits the Commonwealth from introducing certain inculpatory statements at trial. Specifically, as relevant here, the Rule bars the Commonwealth from introducing evidence of statements made by Cridler-Smith to law enforcement *if* those statements were "made in connection with and relevant to" an "offer to plead guilty or nolo contendere[.]"

Cridler-Smith claims the Rule precludes the use of the statements he made to Detective Staub because, in effect, all statements a defendant makes to law enforcement when seeking what the parties have characterized as a "cooperation agreement" are statements related to a larger effort by which a defendant necessarily is offering to plead guilty.  The Commonwealth counters by noting that we previously have acknowledged that there are differences between so-called cooperation agreements and plea agreements, *see Hood v. Commonwealth*, 269 Va. 176, 181 (2005), and that the discussions here were so preliminary "that the statements were instead

15

an offer to cooperate in the hopes of achieving clemency for himself and his brother, and did not fall within the protections of Rule 3A:8." In essence, the Commonwealth argues that unless and until actual plea agreement terms are being discussed, Rule 3A:8(c)(6) does not apply.

Although, as the circuit court noted, there is a dearth of Virginia authority interpreting the scope of Rule 3A:8(c)(6), we find that the plain language of the Rule supports neither of the absolute interpretations offered by the parties. Contrary to Cridler-Smith's interpretation, we can conceive of circumstances where a defendant may wish to make and actually does make statements to law enforcement that are not "made in connection with and relevant to" "an offer to plead guilty[.]" Similarly, however, there are circumstances in which a defendant's statements may be fairly characterized as being "made in connection with and relevant to" "an offer to plead guilty" even though the Commonwealth has yet to expressly make a firm plea offer or even a promise to make one in the future.

The Rule is more nuanced than either of the proffered interpretations would suggest and determining whether a particular statement or statements fall within its scope ultimately turns upon questions of fact. Absent an express agreement by the parties at the outset of any conversation that the conversation either falls within or without the scope of the Rule, a court will be called upon to determine whether or not a particular conversation is covered or not. Answering the question will require a court to consider the totality of the circumstances, including the statements themselves and the context in which they were made.

Given the text of the Rule, a court attempting to make such a determination must begin with an objective review of the actions, thoughts, and intentions of the defendant at the time the statement or statements were made. After all, the explicit text of the Rule prohibits admission of statements "against the person *who made* the plea or offer." Rule 3A:8(c)(6) (emphasis added).

16

By tying the prohibition on admission to the person who "made the . . . offer" to plead guilty, the text makes clear that the pertinent offer comes not from the Commonwealth, but from the defendant. Accordingly, the analysis must begin with whether, explicitly or implicitly, the defendant's statements were "made in connection with and relevant to" an offer by the defendant to plead guilty or nolo contendere.[8] *Id.*

Although the actions, thoughts, and intentions of the defendant begin the analysis, it does not end there. The Rule does not grant a defendant the ability to force unwilling representatives of the Commonwealth to listen to his statements with no hope of utilizing that information at trial. For example, if the Commonwealth has no interest in plea negotiations or offers and makes that position clear, a defendant would make any statements at his peril.

Ultimately, in cases without explicit statements of the parties' intentions, a court will be forced to determine from the circumstances the nature of the conversations. Because the answer will turn on consideration of the totality of the specific circumstances, we cannot provide an exhaustive list of facts that should be considered. In most cases, the statements made (whether an outright confession or just some potentially helpful information), potential motives of a defendant or the Commonwealth, the parties' history and practice, as well as how the conversation fits within the potential resolution of the case or other related cases will color the analysis. In the end, it presents questions that must be resolved by a factfinder.

---

[8] Although the analysis begins with a review of the actions, thoughts, and intentions of the defendant, it does not follow that conversations regarding potential pleas that are initiated by the Commonwealth fall outside of the Rule. If, in a conversation initiated by the Commonwealth, the defendant's actions, thoughts, and intentions establish that a defendant's statements were "made in connection with and relevant to" "an offer to plead guilty," Rule 3A:8(c)(6), such statements are subject to the Rule.

In this case, the factfinder did not make a factual finding for us to review. Rather, it effectively held, in separate orders, that the factual issue of whether Cridler-Smith's statements to Detective Staub were "made in connection with and relevant to" "an offer to plead guilty," Rule 3A:8(c)(6), was a close one. Specifically, the circuit court, in its initial ruling, found "that the record reflects that the parties were quasi-negotiating a plea agreement at the time of [Cridler-Smith]'s statement[s]" to Detective Staub, and that "[i]t is reasonable to characterize [Cridler-Smith]'s statements as made in connection with an offer to plead guilty." However, without repudiating this finding, the circuit court subsequently also found that the record contained objective reasons why a competent attorney could have concluded that Cridler-Smith's statements to Detective Staub fell outside the scope of Rule 3A:8(c)(6). Thus, the circuit court did not make a definitive factual determination as to whether Cridler-Smith's statements were "made in connection with and relevant to" "an offer to plead guilty," Rule 3A:8(c)(6), and thus, we have no factual determination on this issue to review on appeal.

For the reasons stated below, resolution of the factual question is essential to determining whether Cridler-Smith is entitled to relief. Accordingly, we remand the matter to the circuit court with instructions to take any evidence necessary so that it may provide an answer to this central question.

2. The performance prong

We begin our objective review of counsel's performance by recognizing that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Schmuhl v. Clarke*, 302 Va. 481, 497 (2023) (quoting *Hinton v. Alabama*, 571 U.S. 263, 274 (2014)). Thus, at a minimum, a reasonable counsel would have been aware of

18

Rule 3A:8(c)(6). Furthermore, given the circuit court's observation that, on this record, it was reasonable to conclude that "the parties were quasi-negotiating a plea agreement at the time of [Cridler-Smith]'s statement[s]" to Detective Staub, and that Cridler-Smith's "statements [could be characterized] as made in connection with an offer to plead guilty[,]" reasonable counsel would have been aware of at least the possible application of the Rule to this situation. Accordingly, a reasonable counsel would have been aware that invocation of the Rule had the potential to bar Cridler-Smith's confession to Detective Staub from being used at trial.

The Director argues that, even accepting the foregoing, Cridler-Smith has not established deficient performance. Specifically, the Director asserts that bringing a pretrial motion "is a tactical decision involving trial strategy and is afforded great deference upon habeas review[,]" that "counsel could have reasonably decided that a motion to suppress would have failed . . . and [that] counsel [was] not ineffective for failing to make a futile motion[,]" that "[t]he Sixth Amendment does not require counsel to raise every possible argument, much less an argument novel to his jurisdiction[,]" and that counsel "is not constitutionally obligated to raise every possible claim or legal argument at trial and a failure to do so does not render counsel's performance deficient."

We agree with the Director in the abstract. It is and remains true that, in general, deciding which pretrial motions to bring is a matter for counsel to decide and such decisions are entitled to deference. It is and remains true that, in general, counsel is not ineffective for failing to make a futile motion or deciding not to advance every possible argument. We do not, however, evaluate counsel's performance in the abstract, but rather, do so while considering the specific facts and circumstances of the particular case. From such a view, the decision not to contest the admission of the confession in this case was objectively unreasonable.

19

We start with the recognition that "[a] confession is like no other evidence" and can represent "'the most probative and damaging evidence that can be admitted'" in a criminal trial. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)). Accordingly, when a reasonable counsel has a potentially viable challenge to a confession being heard by the factfinder, he will seek to bar its admission absent compelling reasons not to do so.

Although we do not attempt to list every potential reason that might justify counsel not moving to suppress a confession, we say with confidence that none of them are present here. Challenging the introduction of the confession under Rule 3A:8(c)(6), whether by pretrial motion or by simply objecting at trial, essentially was costless.[9] The time, effort, and expense in doing so was minimal at most. Furthermore, and critically, seeking to bar the admission of the confession would not, in any way, have hindered any other strategy that the defense could have

_____

[9] Although Cridler-Smith has challenged counsel's failure to move to suppress the confession by way of pretrial motion, we note that there is no requirement in Rule 3A:8(c)(6) that any objection to admission of covered statements be made by written, pretrial motion. This is in contrast to objections to the admission of statements allegedly obtained in violation of certain constitutional provisions, which require the filing of a written, pretrial motion. *See* Code § 19.2-266.2. Accordingly, the cost of seeking to bar the admission of Cridler-Smith's statements might have been limited to nothing more than the time to research the issue, the uttering of the word "objection" at trial, and then arguing the grounds for the objection.

employed.[10] Not even the Director has suggested any potential downside to counsel seeking to bar admission of the confession, and we can think of none.[11]

Given the foregoing, the Director is left to argue that counsel was not required to move to bar admission of the confession because doing so would have been futile. As noted above, absent additional factfinding below, we are unable to definitively conclude whether a motion to bar the confession pursuant to Rule 3A:8(c)(6) would have been successful or not. Yet, we can conclude that no reasonable counsel could have been sufficiently confident that his attempt to bar introduction of the confession would be unsuccessful to excuse a failure to even attempt to do so.

Over the years, the Commonwealth, on behalf of the Director and various wardens, has consistently argued that a defense attorney is not constitutionally unreasonable for pursuing arguments that have a low chance of success when the facts and circumstances are such that those arguments are the only ones available to a defendant. We consistently have agreed with these arguments. The flip side of that coin is that, when counsel has a potentially winning argument that can be made with no downside cost to the defendant or any aspect of the overall defense strategy, reasonable counsel will make it even if they believe it is likely to fail. When, as in this case, counsel effectively has only one card to play, he is constitutionally unreasonable when he fails to play it. Cridler-Smith has established that counsel's failure to seek to bar the

---

[10] The strategy employed by counsel at trial in this case was to put the Commonwealth to its burden of proof. Counsel cross-examined witnesses called by the Commonwealth, timely moved to strike the Commonwealth's evidence, and made appropriate arguments to the jury. Cridler-Smith and counsel elected not to put on evidence. Given this, it is clear that moving to bar admission of the confession would not have, in any way, adversely affected the strategy counsel actually pursued.

[11] To her considerable credit, counsel for the Director conceded at oral argument in this Court that counsel objecting to the admission of Cridler-Smith's confession at trial would have been "costless" and that there was no "strategic benefit" to Cridler-Smith gained by counsel failing to do so.

21

admission of his confession was constitutionally unreasonable, and thus, he has satisfied the performance prong of the *Strickland* test.

In reaching this conclusion, we do not depart, in any way, from our earlier cases regarding the deference owed by habeas courts to the decisions of trial counsel generally. Trial counsel retain the ability to make reasonable strategic choices regarding what motions to make and when to make them as well as the decision as to which strategies to pursue to advance a defendant's legitimate objectives. Reviewing courts should not engage in speculation as to whether a different course charted by counsel may have reached a better result so long as the actions that were taken were reasonable at the time they were taken. Counsel is not required to pursue arguments that are, on their face, destined to lose. Only in unusual cases will counsel be faced with a potentially winning argument that can be developed with the expenditure of little to no resources and advanced without in any way compromising any other strategic choices a counsel may have made. This is that unusual case, and it is the confluence of these unusual circumstances that permit us to conclude that counsel's decision not to seek to bar the admission of Cridler-Smith's confession failed to meet the level of attorney performance guaranteed by the Sixth Amendment.

3. The prejudice prong

A habeas petitioner seeking to establish that he meets the prejudice prong of *Strickland* is faced with a "heavy burden[.]" *Strickler v. Murray*, 249 Va. 120, 128 (1995). When, as here, a petitioner claims that the ineffectiveness of counsel led to the admission of evidence that should have been excluded, he must demonstrate "that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

22

In this case, the question of prejudice turns entirely on whether Cridler-Smith's statements to Detective Staub fall within the scope of Rule 3A:8(c)(6). There is little question that, absent introduction of the confession, the evidence at trial would have been insufficient to warrant a conviction. In fact, at oral argument in this Court, the Director conceded that, if Cridler-Smith's statements fall within the scope of Rule 3A:8(c)(6), prejudice has been established.

As noted above, whether the statements fall within the scope of Rule 3A:8(c)(6) requires the resolution of a factual question that is not resolved on this record. Thus, we cannot definitively answer the question of whether Cridler-Smith has established *Strickland* prejudice. Accordingly, we must remand the case to resolve that outstanding factual question—whether or not Cridler-Smith's statements to Detective Staub were "made in connection with and relevant to" "an offer to plead guilty," Rule 3A:8(c)(6)—and thus, resolve the question of whether Cridler-Smith is entitled to relief.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court and remand the matter for further proceedings consistent with this opinion.

*Reversed and remanded.*